Dotti D. Jernigan BRYANT, Plaintiff,

v.

INTERNATIONAL SCHOOLS SERVICES, INC., Defendant.

Theresa O. LILLIBRIDGE, Plaintiff,

v.

INTERNATIONAL SCHOOLS SERVICES, INC., Defendant.

Civ. A. Nos. 78–2517, 78–2563.

United States District Court,
D. New Jersey.

Dec. 4, 1980.

474

Yvette Weiss, Trenton, N. J., for plaintiffs.

McCarthy & Hicks, Princeton, N. J., for defendant; Kenneth J. McCulloch, Townley & Updike, New York City, of counsel.

## OPINION

DEBEVOISE, District Judge.

### I. *Parties and Proceedings*

Plaintiffs in these consolidated actions, Theresa O. Lillibridge and Dotti D. Jernigan Bryant, instituted suit under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Plaintiffs charge that the practice of defendant, International Schools Services, Inc. ("ISS"), of awarding to its overseas teachers two kinds of employment contracts having substantially different compensation and benefit provisions constituted unlawful discrimination against plaintiffs on the basis of sex.

Lillibridge and Bryant were teachers employed by ISS at the American School in Isfahan, Iran. Each was hired in Iran at a time when she was married to a person employed in that country either by Bell Helicopter International, Inc. or Grumman Aerospace Corporation, each of which provided goods and services to the Iranian government. Both Lillibridge and Bryant were hired pursuant to what has been called, in this case, a "local–hire" contract, one of the two kinds of contracts which ISS entered into with teaching personnel at the American School. The other kind of contract has been referred to in this case as the "ISS–sponsored" contract, under which an employee received benefits substantially greater than those received under the local–hire contract.

ISS is a private, non–profit corporation organized under the laws of the District of Columbia, with its headquarters in Princeton, New Jersey. ISS works by contract with overseas governments or corporations to operate schools for children of American employees overseas. The services it provides are educational consulting, school operation, education staffing, purchasing, procurement and financial management.

The case was tried without a jury, and decision was reserved. This opinion constitutes this Court's findings of fact and conclusions of law.

### II. *Findings of Fact*

#### A. *The ISS Contracts*

The American School in Isfahan, one of the schools ISS operated, was established in 1973, pursuant to a contract between ISS and Bell Helicopter. The contracts which Bell Helicopter and other companies performed for the Iranian government required the presence of the companies' employees overseas in Iran. These employees

brought their families. It was ISS's responsibility, under its contract, to establish a school and employ and supervise the staff of the school where the children of these employees would be educated. ISS initially contracted with Bell Helicopter to operate the American School; for 1976 and thereafter, ISS contracted directly with the Iranian government to operate the school.

The school term for the American School ran from September of one year through June of the next year, and the staff went on annual leave for the summer months. The American School operated until January 6, 1979, when it was permanently closed due to the revolution in Iran which began in late 1978.

All of the staff at the American School were compensated according to the same base salary scale, which varied depending upon (1) teaching experience and (2) educational achievement. The base salary scale is not an issue in this case.

In addition to base salary, all staff were offered certain other benefits. These benefits were:

1. A continuity incentive equal to 15% of base salary after three years of service and for each subsequent year thereafter;

2. ISS-paid major medical insurance, life insurance and long-term disability insurance;

3. Voluntary participation in a retirement plan. This was a TIAA/CREF plan. The staff member contributed a minimum of 5% of base salary to this retirement plan; if the staff member did this, ISS would contribute 10% of base salary;

4. Voluntary participation in Blue Cross/Blue Shield. ISS would pay 50% of the premium and the staff member would pay the other 50% of the premium.

Teachers at the American School taught under two kinds of contracts—local-hire contracts and ISS-sponsored contracts.[1] Regardless of the kind of contract, the duties of the teachers did not differ. Persons who had ISS-sponsored contracts received additional allowances. These additional allowances were as follows:

1. An overseas allowance paid monthly and equal to 25% of base salary. This was for each member of a teaching couple as of the school year commencing September, 1978, and to one member of the teaching couple prior to that date;

2. A transportation allowance of $150 per month to help offset the costs to be incurred because it was prohibitively expensive to ship automobiles to Iran;

3. Reimbursement for costs of transportation and entry into Iran, including passport fees, and medical examinations;

4. A one-time relocation allowance to assist the transition from previous home to new home in Iran;

5. Housing allowance or housing in an American Community near Isfahan (including utilities);

6. Annual round-trip fare to home of record in the United States for staff member and accompanying dependents;

7. Round-trip airfare to and from the United States in case of a death in the family;

8. Shipping allowance based on weight of baggage for staff members and dependents for initial location and a small allotment on an annual basis thereafter;

9. Transition costs (included hotel, motel and per diem allowance for up to three to four days in the United

1. Although this opinion adopts the conceptual framework established by the parties, namely, that ISS utilized two kinds of contracts for its teaching staff, there was, in fact, a third kind of contract. This third kind was entered into with teaching couples. This contract closely resembled the ISS-sponsored contract, differing from it, however, in certain respects which will be discussed during the course of the opinion. The parties treated such a contract as an ISS-sponsored contract.

States, and for up to twenty–eight days in Isfahan);

10. Storage of household goods at home of record (up to $500 per year); and

11. Annual round–trip airfare for college age children (up to four round–trips per four–year period).

The extra benefits paid under the ISS–sponsored contracts were comparable to extra benefits which business corporations under contract with the Iranian government paid to United States citizens they recruited to work in Iran. ISS specifically patterned its benefits upon those provided by Bell Helicopter.

Teachers having ISS–sponsored contracts were hired in the United States and in Isfahan; teachers having local–hire contracts were hired only in Isfahan.

B. *Bryant's Employment by ISS*

Bryant was married to Marc Jernigan in 1974 and was an elementary school teacher by profession. She expected to accompany her husband to Iran, where he was to be employed by Grumman. She learned of ISS from a Grumman employee and wrote to ISS at Princeton, New Jersey, informing it of her expected arrival in Isfahan, Iran, in October 1975. ISS sent her application forms, which she completed and returned in early May, 1975. Receiving no response, Bryant made inquiry by letter dated July 30, 1975, again addressing her letter to ISS at Princeton. On September 22, 1975, ISS replied, stating that all positions were filled and advising her to communicate with the School superintendent upon her arrival in Isfahan.

When Bryant arrived in Isfahan in November, 1975, a Grumman employee introduced her to Michael White, the principal of the American School's Middle School. He already had her résumé and hired her forthwith as a substitute teacher, paid on a daily basis. In April 1976, ISS hired Bryant on a full–time basis and entered into a local–hire contract with her. The contract recited that Bryant was entitled to participate in the benefit program attached to the letter agreement. There was no attachment to the letter agreement. She was not informed of the fact that there were two kinds of contract, nor was she given a copy of the School's personnel manual.

While she was a substitute teacher she had heard of certain allowances being paid to some of the teachers.

After her employment under a local–hire contract commenced, Bryant asked the American School's assistant superintendent, Ralph Englesby, whether she would receive these allowances. He replied in the negative and, during the course of their discussion, informed her, "You can sue for them."

At a faculty meeting at the end of the 1975–76 school year which Bryant attended, Dr. Howard Wire, Superintendent of the American School, was asked about the disparity between payments under local–hire contracts and ISS–sponsored contracts. Apparently there was a discussion of an EEOC case entitled *Michele Dick v. Telemedia*, in which a woman married to a man who worked in Iran was awarded damages for unpaid benefits on the grounds that she, as a married woman, had suffered from discriminatory treatment vis–a–vis married men. Dr. Wire defended ISS's policy of awarding contracts with different benefits. Asked by one of the women if it wouldn't be smart to go to the United States to sue ISS, Dr. Wire stated that "I wouldn't do so if I were you while you and your husband are employed here."

In October, 1976, Bryant signed another local–hire contract for the school year 1976–77. In March of 1977 Bryant and her spouse decided to seek a divorce. She remained in Iran until June in order to complete her contract with ISS and then returned to the United States. During the period while she was employed under a local–hire contract she received none of the extra benefits provided by an ISS–sponsored contract. She received the equivalent of some of these benefits through her husband's employer, Grumman, such as the expenses of her trip to Iran, housing in Iran, luggage allowance, and moving allowance.

## C. *Lillibridge's Employment by ISS*

In May, 1975, Lillibridge, a teacher by profession, accompanied her husband to Iran where he was employed as a pilot by Bell Helicopter. She learned of the American School and, in late June or early July, 1975, she had an interview with Dr. Wire. She completed application forms which disclosed her marital status, the fact that her husband did not teach, and her local address, which also disclosed her husband's affiliation with Bell Helicopter. Lillibridge was not hired at that time, but in October, 1975 she was interviewed by Ralph Englesby and then by Michael White, who hired her to teach the sixth grade.

Shortly afterward she received the contract form which had "Local Hire Contract" written at the top. No one explained to her what that meant. There was a reference to an attached schedule of benefits, but no such schedule accompanied the copy of the contract sent to Lillibridge. She, like Bryant, was not told there were two kinds of contracts and she, too, was not provided with a copy of the pamphlet describing the American School's personnel policies.

After starting her employment Lillibridge learned about additional allowances some teachers were receiving, and on one occasion she inquired of White whether she, too, could receive a travel allowance to visit the United States. He told her the difference arose from the fact that she was hired in Iran and referred her to Dr. Wire. Dr. Wire then explained that there were two kinds of contracts–those for persons hired in the United States, who received the extra benefits, and those for persons hired in Iran, who did not receive the extra benefits.

Lillibridge attended the faculty meeting at which the disparities between the two forms of contract and the *Michele Dick* case were discussed.

In the spring of 1976 Lillibridge was re-hired under a local-hire contract for the 1976–77 school year. Her husband's contract as an instructor pilot with Bell Helicopter terminated on April 7, 1977. He accepted an additional one-year contract in order to enable her to complete her obliga-

tion to ISS for that year and sign up to teach for the 1977–78 school year. Consequently, Lillibridge entered into a local-hire contract for the 1977–78 school year. She took an approved leave of absence in 1978–79, expecting to return in the fall of 1979, but the Iranian revolution intervened.

In the spring of 1978 C. William Schultheis and Burckhard Blob from ISS's headquarters went to Isfahan to explain ISS's personnel policies and benefits to the American School faculty. They stated, at a meeting of the faculty, that there were two kinds of contract. The reason for not paying the additional benefits under the local-hire contracts was that the persons hired locally in Iran did not need the benefits provided by an ISS-sponsored contract because they received these benefits through their husbands under their husbands' contracts.

Lillibridge did not receive any of the extra benefits provided by the ISS-sponsored contract while she was a teacher at the American School. She did receive the equivalent of some of these benefits through her husband's employer, Bell Helicopter, such as certain travel allowances, her initial trip to Iran, and shipment of household goods.

## D. *ISS's Hiring and Placement Practices*

ISS is a non-profit corporation founded for the purpose of providing educational services to English-speaking children living abroad. These services are designed to enable students to re-enter the American educational system upon their return to the United States. ISS has received its funds from foundations and, more recently, under contracts with the United States government and American companies doing business overseas.

The kinds of services ISS provides include staffing and teaching referral programs, financial management, cooperative purchasing and school management programs–the development and operation of schools.

ISS established and followed a routine procedure for processing applications for teaching positions. When it received an

inquiry from a person interested in teaching abroad it sent an application form and information about ISS to the applicant. The form asked for information about the applicant's marital status, whether the applicant's spouse also taught, the number of persons who would be accompanying the applicant abroad, the applicant's educational and teaching experience, and the geographical areas in which the applicant would not be willing to teach. ISS would not process an application which excluded all but one geographical area.

After receiving back the form, ISS arranged for an interview with the applicant at Princeton or elsewhere in the United States or abroad. Upon completion of this process the applicant's dossier was activated, that is to say, it was available to be sent to schools seeking teachers.

When overseas schools requested that ISS's referral services provide candidates for teaching positions, ISS reviewed its files of qualified candidates and inquired of those who met the specified qualifications whether they wished to have their dossiers sent to the school seeking teachers. Upon receipt of an affirmative answer the dossier was sent out and the school made the selection.

With respect to overseas schools which ISS itself operated, ISS would communicate with the administrator as to his need for teachers and send him dossiers of candidates for open positions.

Turning specifically to the American School in Isfahan, Iran, Bell Helicopter communicated with ISS and sought the establishment of a school in Isfahan for children of employees of Bell Helicopter working in that part of Iran. ISS and Bell Helicopter entered into a cost–plus contract for the establishment of such a school and, pursuant to the contract, the American School in Isfahan was organized in the summer of 1973, opening its doors to 100–150 students in October of that year.

In the fall of 1975 a second contractor doing work in Iran, Grumman, joined Bell Helicopter on the ISS contract to provide a school for dependent children. Both compa-nies were under contract with the Department of Defense, which had contracted with the Iranian government. Inasmuch as these contracts were on a cost-plus basis and Bell Helicopter's and Grumman's payments to ISS constituted part of their costs, the Iranian government concluded that it would contract directly with ISS and thereby avoid duplicate charges. Consequently, on March 26, 1976, a contract was entered into between ISS and the Military Industries Organization, Government of Iran, effective July 1, 1976 to June 30, 1979. Under this agreement ISS continued to "operate and manage at Isfahan, Iran an American Educational Program for kindergarten and grades 1 through 12 for dependent children of [Grumman, Bell Helicopter and certain others]." Payment was on a cost–plus basis. The American School grew from just under 200 children during the 1973–74 school year to 1800 children at the time it had to be closed.

From the beginning, in 1973, the School was staffed in large part by using the ISS referral service. If it was determined after the beginning of a school year that more teachers were needed, resort was had to Americans in Iran. ISS counted on there being an adequate supply of such persons among the wives of Bell Helicopter and Grumman employees. ISS was not looking specifically for women to fill these positions locally, but it was aware that most, if not all, Bell Helicopter and Grumman employees in Iran were men and that, therefore, the pool from which ISS teachers were to be recruited locally consisted nearly entirely, or entirely, of women.

All of the teachers whom ISS hired through its referral service were given ISS–sponsored contracts with the full panoply of benefits. As for the teachers hired locally, ISS awarded some ISS–sponsored contracts and some local–hire contracts.

Both before commencement of this action and during the course of this litigation ISS has articulated several different bases for distinguishing between persons receiving ISS–sponsored contracts and persons receiving local–hire contracts. It is abundantly

clear that ISS did not succeed in perfecting its rationale until the cl sing phases of this law suit. However, even though ISS never clearly expressed what it was doing either to itself or to others, the evidence suggests that in fact ISS's criterion for awarding contracts was a subjective one, namely, whether the teacher came to Iran and remained there for the primary purpose of teaching at the American School or whether the teacher came to Iran and remained there primarily for some other purpose. In the former situation the teacher was awarded an ISS–sponsored contract and in the latter situation the teacher was awarded a local–hire contract.

ISS decided what was the teacher's primary purpose for coming to or remaining in Iran on the basis of whether the teacher's spouse was employed by Bell Helicopter or Grumman or perhaps some other American company in Iran. Such employment by the spouse would lead ISS to conclude that the would-be teacher and her/his spouse were induced to come to Iran by the spouse's employment and that, presumably, the couple was already receiving benefits comparable to the ones offered by ISS to attract teachers to Iran.

Bryant and Lillibridge claim that ISS's method of awarding two types of contracts discriminated against them on the basis of sex, in violation of Title VII. Specifically, they maintain that the benefits policy resulted in disparate treatment and/or had a disparate impact on them—married females whose spouses were not employed by ISS.

ISS maintains that its benefits policy was applied equally to males and females and therefore could not result in disparate treatment. Moreover, ISS maintains that its policy did not have a disparate impact on females.

### E. The Impact of ISS's Contract Practices

The distribution of local-hire contracts, by sex, during the years when one or both plaintiffs were employed at the American School was as follows:

| Year | Male | Female |
|---|---|---|
| 1975–76 | 0 | 15 |
| 1976–77 | 1[2] | 24 |
| 1977–78 | 0 | 28 |
| 1978–79 | 0 | 30 |
| Total | 1 | 97 |

All of the females who held local–hire contracts were married.

The distribution of ISS–sponsored contracts, by sex, during the years 1975–1979 was as follows:

| | Males | Females |
|---|---|---|
| 1975–76 | 32 | 33 |
| 1976–77 | 53 | 54 |
| 1977–78 | 71 | 71 |
| 1978–79 | 80 | 82 |
| | 236 | 240 |
| | (49.58%) | (50.42%) |

The distribution of ISS–sponsored contracts by married and single males and females during the years 1975–1979 was as follows:

| | Single Females | Married Females | Single Males | Married Males |
|---|---|---|---|---|
| 1975–76 | 20 | 13 | 7 | 25 |
| 1976–77 | 35 | 19 | 17 | 36 |
| 1977–78 | 47 | 24 | 27 | 44 |
| 1978–79 | 46 | 36 | 29 | 51 |
| | 148 | 92 | 80 | 156 |
| | 240 | | 236 | |

The number of males and females having ISS–sponsored contracts as a teaching team during the years 1975–79 was as follows:

| | Males | Females |
|---|---|---|
| 1975–76 | 11 | 11 |
| 1976–77 | 15 | 15 |
| 1977–78 | 20 | 20 |
| 1978–79 | 31 | 31 |

Comparing the immediately preceding two tables it can be seen that in each year most of the married females receiving ISS–sponsored contracts were part of a teaching couple. With a few exceptions, the remaining married women having ISS–sponsored contracts were separated, divorced or other-

2. One male, James Williams, held a local–hire contract for one year because he lacked qualification. He subsequently held ISS-sponsored contracts.

wise living apart from their spouses. By way of contrast, all men, married and single (with one exception, described in n. 2) held ISS–sponsored contracts. Most married men were not part of a teaching team.

ISS called as an expert witness Dr. Paul Andrisani, associate professor of industrial relations, School of Business Administration, Temple University. The purpose of his testimony was to show whether discrimination can be demonstrated in this case by an adverse impact analysis.

The major portion of Dr. Andrisani's testimony and report was directed to establishing a conclusion with which neither plaintiffs nor ISS disagreed. He demonstrated, on the basis of the statistics available to him, that there was no discrimination as between women and men in awarding ISS–sponsored contracts to applicants for teaching positions who applied in the United States. Although this conclusion was not in dispute, establishing it was useful because it demonstrated the methodology of using statistical data to show adverse impact.

An adverse impact analysis calls for the comparison of various pools. If the question is whether there has been discrimination against females in the selection for ISS–sponsored contracts at the American School, one of the pools to be compared is made up of those persons (both males and females) who received the ISS–sponsored contracts. To determine if statistically there appeared to be discrimination, that pool must be compared with the pool of all males and females who were candidates for positions at the American School.

The pools of females and males who held ISS–sponsored contracts in the applicable school years was compared with three different pools: (i) the females and males who had their dossiers sent to the American School during the twelve–month period prior to the applicable school year (Appendix A); (ii) the females and males who had the opportunity to have their dossiers sent to the American School during the twelve–month period prior to the applicable school year (Appendix B); and (iii) the number of females and males who became newly active candidates for placement by the ISS referral service during the twelve–month period prior to the applicable school year (Appendix C). As can be seen from Appendices A, B and C, using these pools, the statistics suggest that there was no discrimination as between males and females in the award of ISS–sponsored contracts. Females received their expected rate of such contracts.

Plaintiffs contend, however, that the fact that there were 98 less desirable local–hire contracts awarded, and that 97 of the 98 were awarded to married women, is probative of discrimination against married women. Addressing himself to this contention, Dr. Andrisani testified that, standing alone, that figure is statistically meaningless. In order to determine whether those figures supported a conclusion that there was an adverse impact on women (or married women) it would be necessary to know the number of females and males (or married females and married males) who applied locally. With those figures it would be possible to compare the actual selection rate with the expected selection rate. Without those figures, according to Dr. Andrisani, the data is simply not available to determine, on a statistical basis, if females (or married females) suffered an adverse impact.

The foregoing is a summary of the basic facts established by the evidence. Certain additional factual findings will be set forth in subsequent sections of this opinion.

III. *Jurisdictional Prerequisites to Suit*

In its post–trial memorandum, ISS raised for the first time a contention that plaintiffs failed to establish that they have complied with steps required by Title VII before suit may be instituted in this Court: (i) timely filing of a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), 42 U.S.C. § 2000e–5(e); (ii) deferral of the charge to the appropriate state or local agency, 42 U.S.C. § 2000e–5(c); (iii) issuance by EEOC to plaintiffs of right–to–sue notices, 42 U.S.C. § 2000e–5(f)(1), and (iv) institution of suit by plaintiffs within ninety (90) days of receipt of the notice, 42 U.S.C. § 2000e–5(f)(1).

Plaintiffs' complaints alleged compliance with these requirements in full detail. Although defendant's answers contained a denial that the Court had jurisdiction under 42 U.S.C. § 2000e–5 and denied plaintiffs' specific allegation showing compliance with the statutory conditions, at no point in the lengthy pretrial discovery and motion proceedings did ISS, which was represented by experienced and sophisticated attorneys, raise the issue of non–compliance with those conditions by motion or otherwise.

A detailed Final Pretrial Stipulation and Order was entered. It was signed by ISS's attorney and stated, at page 2, that "Jurisdiction is specifically conferred on this Court by 42 U.S.C. § 2000e–5." Under "Defendant's statement of the legal issues in this case and the law applicable to these issues" (page 43, *et seq.*, of the Final Pretrial Stipulation and Order) ISS set forth only two issues relating to jurisdiction: (i) whether Title VII applies extraterritorially, and (ii) whether the "Act of State" doctrine and the foreign compulsion defense are applicable to this action. Nowhere did ISS in any way suggest that it contested the provision of the Pretrial Stipulation and Order that jurisdiction is conferred on the Court by 42 U.S.C. § 2000e–5 or that the facts alleged in plaintiffs' complaints in this regard were untrue. Under *Fed.R.Civ.P.* 16 a pretrial order modifies and supersedes conflicting pleadings, "limits the issues for trial" and "controls the course of the action".

At no time did ISS move to modify the Pretrial Stipulation and Order or suggest that it had facts which contradicted those alleged to support jurisdiction. ISS's trial brief did not contain so much as a hint that ISS contended that plaintiffs had not complied with the requirements of 42 U.S.C. § 2000e–5, nor did ISS raise this point in its closing argument, aware, no doubt, that the Court might well have reopened the case so that plaintiffs could have cured any technical deficiency of proof.

[1] In view of the affirmative statement of jurisdiction in the Pretrial Stipulation and Order, which was signed by ISS, and in view of ISS's failure to set forth this question as a legal or factual issue in this case, I do not believe that there is even a technical failure of proof that plaintiffs complied with the conditions of 42 U.S.C. § 2000e–5. Were there such a deficiency I would reopen the case to permit the gap to be filled. Moreover, the tactic of lulling an adversary into security and hitting her/him with a last–minute surprise is not welcome in this Court.

## IV. *Extraterritorial Application of Title VII*

ISS urges that Title VII does not apply extraterritorially and that, therefore, the Court lacks subject matter jurisdiction. ISS advances the following reasons in support of its position:

First, as in the case of the National Labor Relations Act, 29 U.S.C. § 141, *et seq.*, Title VII contains no clear affirmative expression setting forth the territorial jurisdiction of the Act. The National Labor Relations Act does not apply outside the territorial jurisdiction of the United States, *RCA OMS, Inc.*, 202 N.L.R.B. 228 (1973); *GTE Automatic Electric, Inc.*, 226 N.L.R.B. 1222 (1976). ISS concludes that by analogy Title VII should be given the same limited construction.

Second, prior to the enactment of Title VII various other labor laws were narrowly construed to preclude extraterritorial application, *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 69 S.Ct. 575, 93 L.Ed. 680 (1949); *Benz v. Compania Naviera Hidalgo*, 353 U.S. 138, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957); *McCulloch v. Sociedad Nacional*, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963). ISS argues that it would be illogical to think that Congress would grant EEOC the same investigatory powers as it granted to the NLRB and, at the same time, give EEOC greater territorial jurisdiction unless Congress specifically so provided.

Third, ISS contends that § 206(d) of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* (commonly known as the Equal Pay Act), should be read *in pari materia* with Title VII. The Equal Pay Act does not

apply outside the territorial jurisdiction of the United States, 29 U.S.C. § 213(f), and, again, ISS argues that it would be illogical to think that Congress meant to limit the jurisdiction of the Equal Pay Act and not Title VII when the two are to be read in harmony with one another.

Fourth, ISS asserts that given the sensitive nature of international affairs, to apply Title VII extraterritorially without an affirmative Congressional expression to do so is unwarranted.

Fifth, ISS seeks comfort from the recent case of *Rossi v. Brown*, 24 EPD ¶ 31,238 (D.C.Cir.1980). The issue in the *Rossi* case was whether an agreement with the Republic of the Philippines constituted a treaty, which would form the basis for permissible discrimination against the plaintiff. Section 106 of Public Law No. 92–129 [3] prohibited discrimination against United States citizens in the employment of civilian personnel on United States military bases overseas unless such discrimination is permitted by treaty. ISS stated, in a letter memorandum to the Court, "Title VII was intended to offer protection against discrimination to civilian applicants and employees of the military .... It has been so construed in *Johnson v. Alexander*, 572 F.2d 1219 (8th Cir. 1978), cert. den., 439 U.S. 986, 99 S.Ct. 579, 58 L.Ed.2d 658 (1978), reh'g den., 439 U.S. 1135, 99 S.Ct. 1061, 59 L.Ed.2d 98 (1979) ... Given the application of Title VII to civilian employees of the Armed Services, the existence of Section 106 of Public Law No. 92–129, and its legislative history, make no sense *unless* it were intended by Congress that Title VII *not* apply extraterritorially."

The short answer to all of ISS's arguments against giving extraterritorial effect to Title VII is that Congress has spoken on the subject and that a fair interpretation of the statutory language leads to the conclusion that Title VII is to be given extraterritorial effect.

■ The question whether an act applies extraterritorially is a matter of statutory construction, for it is well settled that Congress has the power to extend the reach of its laws to American citizens outside the geographical boundaries of the United States. *Foley Bros. v. Filardo, supra; Blackmer v. United States*, 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375 (1932). The provision of Title VII exempting certain entities, 42 U.S.C. § 2000e–1, provides in pertinent part:

> This subchapter shall not apply to an employer with respect to the employment of *aliens outside any State*, or to a religious corporation ... (Emphasis added.)

By negative implication, since Congress explicitly excluded aliens employed outside of any state, it must have intended to provide relief to non–aliens, *i.e.*, American citizens, outside of any state by an employer otherwise covered by the Act. *Love v. Pullman Co.*, 12 EPD ¶ 11,225 (D.Colo.1976).

The *Love* case dealt with the extent to which Canadian porters (aliens) were protected by Title VII and concluded that when such porters operated in the United States they were entitled to relief. In a footnote, the Court explained:

> This discussion assumes that the porters in Montreal were not American citizens. American citizens who were employed by Pullman in Canada are entitled to full relief without any subtraction. This conclusion rests on the negative inference of § 702 of the Civil Rights Act of 1964. 42 U.S.C. § 2000e–1. Since Congress explicitly excluded aliens employed outside of any state, it must have intended to provide relief to American citizens

---

**3.** § 106 of Pub.L. 92–129 provided:

> Unless provided by treaty, no person shall be discriminated against by the Department of Defense or by any officer or employee thereof, in the employment of civilian personnel at any facility or installation operated by the Department of Defense in any foreign country because such person is a citizen of

the United States or is a dependent of a member of the Armed Forces of the United States. As used in this section, the term 'facility or installation operated by the Department of Defense' shall include, but shall not be limited to, any officer's club, non–commissioned officers' club, post exchange, or commissary store.

employed outside of any state in an industry affecting commerce by an employer otherwise covered under the act. Nothing in the legislative history addresses this specific point, but neither is it contra–indicated. Equal Employment Opportunity Commission, Legislative History of Titles VII and XI of Civil Rights Act of 1964. Our research has revealed no cases directly in point. An additional support for this interpretation comes from the international or extraterritorial application of the antitrust laws. *See, e. g., Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 [82 S.Ct. 1404, 8 L.Ed.2d 777] (1962). *Id.* at n. 4.

The extraterritoriality issue was raised but not decided in *EEOC v. Institute of Gas Technology*, 23 FEP Cases 825 (N.D.Ill. 1980). In *Fernandez v. Wynn Oil Co.*, 20 FEP Cases 1162 (C.D.Cal.1979), the Court ruled on the merits of a case involving allegedly discriminatory employment qualifications applied to women seeking work in Latin America and Southeast Asia. The Court exercised jurisdiction without discussing the question whether it was entitled to do so.

The language of Title VII quoted above distinguishes it from the other statutes to which ISS refers. The fact that those statutes have been construed not to apply extraterritorially, therefore, does not govern the construction of Title VII.

ISS's argument that the enactment of Pub.L. 92–129, § 106 makes no sense unless it were intended by Congress that Title VII *not* apply extraterritorially fails for two reasons. First, even though Title VII is applicable to civilian employees of the armed services, 42 U.S.C. § 2000e–16, and even though, given extraterritorial effect, Title VII would be applicable to civilian employees at overseas facilities of the Armed Forces, it was not so applicable at the time of enactment of Pub.L. 92–129, § 106. Until it was amended in 1972 by the Equal Employment Opportunity Act, Title VII did not protect federal employees within or without the United States, *Brown v. GSA*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402

(1976). Thus, when Pub.L. 92–129, § 106 was enacted in 1971, Title VII was not yet applicable to civilian employees of the federal government. Second, Title VII and Pub.L. 92–129, § 106, are directed to different forms of discrimination. The former is directed to discrimination on account of race, color, religion, sex or national origin and the latter, dealing with a much narrower problem than that with which Title VII deals, is directed to discrimination on account of citizenship or being a dependent of a member of the United States Armed Forces.

Thus, I conclude that Title VII has extraterritorial effect and was applicable to ISS's employment practices in Iran.

### V. Findings and Conclusions as to Prima Facie Case

Plaintiffs charge both that ISS's hiring practices constituted disparate treatment of them on the basis of their sex and that these hiring practices resulted in a disparate impact upon married women. Plaintiffs do not challenge ISS's hiring practices at its Princeton, New Jersey headquarters, which admittedly resulted in neither disparate treatment nor disparate impact affecting women. They challenge ISS's hiring practices at Isfahan, Iran, and the awarding of local–hire and ISS–sponsored contracts there.

In a disparate treatment case a plaintiff must carry the initial burden of establishing a prima facie case of discrimination. The classic method of making this initial showing is to establish (i) that the plaintiff belongs to the protected class, (ii) that he applied and was qualified for a position for which the employer was seeking applicants, (iii) that, despite his qualifications, he was rejected, and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of plaintiff's qualifications. *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Such proofs, however, are not the only method of establishing a prima facie case; the facts will vary, and in different situations different facts will pro-

484

vide a basis for a plaintiff's prima facie case, *e. g., Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977). The Third Circuit has not been overly demanding in the proof required for a prima facie case. Usually all that is required is some showing that plaintiff was treated differently from similarly situated individuals of a different racial or sex group, *Jackson v. U. S. Steel Corp.*, 624 F.2d 436 (3d Cir. 1980).

In the present case, Bryant and Lillibridge are members of a protected class— women. The fact that the alleged discrimination affects only a portion of the class, *i. e.*, a subclass consisting of married women, is immaterial. *Jurinko v. Edwin L. Wiegand Company*, 477 F.2d 1038 (3d Cir. 1973), *vacated and remanded on other grounds*, 414 U.S. 970, 94 S.Ct. 293, 38 L.Ed.2d 214; *Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194 (7th Cir. 1971), *cert. denied*, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543. Having the same professional qualifications as married men, they received the less desirable local–hire contracts, and the married men (with the exception referred to in n. 2) received the more desirable ISS–sponsored contracts.

The statistics show that out of 98 local–hire contracts awarded at the American School, 97 were awarded to married women and only 1 to a married man, that single exception arising from a unique situation, as explained above. A bare statistic such as that may not alone establish a prima facie case without the further showing that there were similarly situated male applicants for the positions held by plaintiffs, *e. g., EEOC v. Greyhound Lines, Inc.*, 635 F.2d 188 (3d Cir. 1980); *Miller v. Weber*, 577 F.2d 75 (8th Cir. 1978). However, in the circumstances of this case, these figures may be considered as one element of a prima facie case, *e. g., Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239 (3d Cir. 1975), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679. This statistical data is buttressed by other factors, as was the case in *Wetzel, supra.*

Married women hired locally were not provided with complete and accurate information concerning ISS's policies and practices with respect to benefits and the granting or withholding of ISS–sponsored contracts.

ISS gave confused and conflicting reasons for granting ISS–sponsored contracts to some persons and withholding such contracts from others: (i) ISS's Superintendent, Mr. Wire, informed Lillibridge, and ISS's New Jersey attorneys informed the Newark office of EEOC, that the kind of contract a person received depended on the place where the person was hired, *i. e.*, persons hired in the United States received ISS–sponsored contracts; persons hired in Iran received local–hire contracts. (The facts did not sustain that explanation.) (ii) After the first explanation proved inadequate under scrutiny, ISS suggested that the distinction was based upon the employee's primary reason for being in Iran. Persons whose primary purpose for being in Iran was to work at the American School were awarded ISS–sponsored contracts; persons who had another primary purpose for being in Iran were awarded local–hire contracts. (iii) ISS contended at trial that the Iranian government required that it award employment contracts so that extra benefits such as those contained in the ISS–sponsored contracts were not paid both to a husband and a wife by employers having cost–plus agreements with the Iranian government and, therefore, an ISS–sponsored contract could not be awarded to a person whose spouse was employed in Iran by a corporation which paid its employees benefits comparable to the extra benefits under an ISS–sponsored contract. (iv) ISS's final articulation of its policy is a variant of the primary purpose explanation. According to ISS, ISS–sponsored contracts were awarded on the basis of whether a person was sponsored to the Iranian government by ISS or some other entity, the employer responsible for bringing the employee to, or retaining the employee in, Iran being the sponsor of the employee. ISS–sponsored contracts were given to teachers whom ISS brought to, or retained

in, Iran. Plaintiffs professed never to have heard of such a concept while they were in ISS's employ, and I am confident that they are telling the truth in this regard. Although the term "ISS–sponsored" appeared in ISS's personnel policies statements, their policies statements were never made available to plaintiffs. The term "ISS–sponsored contract" first appeared in the 1978–79 personnel policies statement, the contracts with the superior benefits having been called "expatriate contracts" (in the 1975–76 personnel policies statement) and "foreign contracts" (in the 1976–77 and 1977–78 personnel policies statements).[4]

It cannot be ascertained from reading the personnel policies statements whether the term "ISS–sponsored", as used in the policies statements, means the same thing as the term "ISS–sponsored" means when used by ISS in its most recent characterization of its policies for awarding contracts in Iran. It appears to me that the articulation of policies for awarding ISS–sponsored contracts in the 1975–76 and 1976–77 personnel policies statements was different from the articulation of those policies in the 1977–78 and 1978–79 personnel policies statements. In the former two school years such contracts were to be awarded only to "heads of households" (suggestive of married men), while in the latter two school years the heads of households requirement was omitted. This parallels the refinements in the

language relating to payments of the pay differential to married couples.[5]

The language changes in the personnel policies statements concerning the kinds of contracts awarded represented an effort on ISS's part to eliminate any suggestion that they were engaging in policies which discriminated on the basis of sex without changing in any way what ISS was actually doing.

I find, therefore, that these facts establish a prima facie case of disparate treatment.

Turning to the question whether plaintiffs have established a prima facie case of disparate impact, plaintiffs must demonstrate that a protected group (married women, in this case) suffered substantially disproportionate effects from a seemingly neutral policy, *EEOC v. Greyhound Lines, Inc., supra.*

The neutral local hiring policy, as found in Part D of the Findings of Fact, was the awarding of ISS–sponsored contracts to teachers whose primary purpose for being in Iran was to teach at the American School. Implementing the policy, ISS did not explain it to married women applicants but made the determination that if a teacher's spouse worked for Bell Helicopter, Grumman, or perhaps some other American company in Iran, the primary purpose of the teacher for being in Iran was to accom-

---

**4.** According to the 1975–76 and 1976–77 personnel policies statements expatriate contracts or foreign contracts (contracts with the superior benefits) were "offered to International Schools Services sponsored heads–of–household employed in the United States or an overseas location, including Iran. A one year contract is offered to locally hired teachers who are not ISS–sponsored." According to the 1977–78 and 1978–79 personnel policies statements (from which the heads–of–household criterion was dropped) the contracts with the superior benefits were "offered to International Schools Services sponsored staff employed in the United States or an overseas location, including Iran. A one–year contract is offered to teachers who are not ISS sponsored." *See* Exhibits P1, P3, P4 and P5. This information also was unavailable to plaintiffs until after discovery had been undertaken in this case.

**5.** The manner in which ISS awarded the overseas pay differential to teaching couples is illustrative of the fact that during the applicable period ISS was groping for a policy and a rationale for allocation of benefits where married persons were involved. The pay differential in the case of married couples was described in the personnel policies statements in successive years as follows: 1975–76–"If a husband–wife team are members of the staff, only the head–of–the–household will receive this allowance." 1976–77–"If a husband–wife team are members of the staff only the head of the household will receive this allowance. The head of the household may be either spouse." 1977–78–"If a husband–wife team are members of the staff, the family unit will receive one monthly differential equal to 25% of the higher base pay of the team." 1978–79–"ISS sponsored staff members will receive a monthly differential equal to 25% of their base pay."

pany the spouse and not to teach at the American School, thus requiring that the teacher be awarded a local–hire contract. This facially neutral policy resulted in the award of 97 local–hire contracts to married women and only one to a married man.

ISS argues that these statistics cannot support a prima facie showing of disparate impact and that the complete statistical data affirmatively demonstrates that ISS's policies have not had a disparate impact. To be meaningful, ISS argues, statistical data must compare two pools–the pool consisting of the males and females (or married males and married females) who received the desired contracts as compared with the pool consisting of the qualified males and females (or married males and married females) who were candidates for the desired contracts. As noted in Part E of the Findings of Fact, a comparison of the various pools applicable to ISS's over–all allocation of ISS–sponsored contracts (including those awarded from Princeton and those awarded locally in Iran) discloses that women received the expected number of the more favorable contracts.

ISS maintains that it is impossible to make a statistical showing of adverse impact if one looks only at ISS's hiring effected in Iran. Figures for one of the pools are available, namely the number of married men and the number of married women who received local–hire contracts. Figures for the applicant pool, however, are unavailable. There is no way of knowing the number of married men and married women who applied locally for teaching positions, all records providing such information having been lost in the sudden departure from Iran.

There is support for ISS's position that the statistics alone in this case cannot support a prima facie showing of disparate impact. *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). In *EEOC v. Greyhound Lines, Inc., supra*, the Court, in deciding in favor of the employer, noted that "EEOC

produced no evidence that Greyhound's no–beard policy selects applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants". 635 F.2d at 188.

However, statistics comparing recipient and applicant pools are not the only method of establishing a prima facie case when adverse impact is alleged. In *Dothard v. Rawlinson*, 433 U.S. 321, 330, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977), the Court stated, "There is no requirement, however, that a statistical showing of disproportionate impact must always be based on analysis of characteristics of actual applicants." In *Yuhas v. Libbey–Owens–Ford Co.*, 562 F.2d 496 (7th Cir. 1977), *cert. denied*, 435 U.S. 934, 98 S.Ct. 1510, 55 L.Ed.2d 531 (1978), the bare fact that a rule against hiring a spouse of a current employee disqualified 71 women job applicants as against the disqualification of only three men applicants was held sufficient to create a prima facie showing of disparate impact, although the Court ultimately concluded that the rule was job–related and therefore not a violation of Title VII.

In the present case there exist not only the actual figures showing the disproportionate number of local–hire contracts received by married women, but there also exists the fact that the records of local applications are unavailable and the various circumstances which led me to conclude that plaintiffs have established a prima facie case of disparate treatment. In the light of all these circumstances, I conclude that plaintiffs have established a prima facie case of disparate impact.

VI. *Findings and Conclusions as to Non–discriminatory Reasons for Award of Local–Hire Contracts to Plaintiffs and as to Job–Relatedness of ISS's Policies.*

Plaintiffs having established a prima facie case of disparate treatment, it becomes ISS's burden to articulate some legitimate, non–discriminatory reasons for not awarding ISS–sponsored contracts to plaintiffs, *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *Board of Trustees v. Sweeney*, 439

U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978). Further, plaintiffs having established a prima facie case of disparate impact, ISS must meet the burden of showing that its practices have a manifest relationship to the employment in question, *Dothard v. Rawlinson, supra,* 433 U.S. at 329, 97 S.Ct. at 2726; *Griggs v. Duke Power Co., supra,* 401 U.S. at 432, 91 S.Ct. at 854.

■ ISS advances a number of very persuasive reasons why it awarded ISS–sponsored contracts only to teachers whose primary purpose for being in Iran was to teach at the American School and why it awarded local–hire contracts to plaintiffs. First, the extra benefits were needed to induce people not otherwise intending to travel to, or remain in, Iran to go or stay there. If a person is hired specifically to live and work in a relatively unattractive overseas location, he or she is entitled to additional benefits, and without such benefits it would be impossible to recruit qualified personnel.

On the other hand, persons who were in Iran for reasons other than teaching at the American School did not have to be enticed there or compensated for the expenses incurred to travel to Iran. ISS points to comparable compensation differentials paid by governmental agencies in similar situations for similar purposes (Exhibits D3, D4, D5, D8, D11).

This is a logical distinction, ISS contends, and is not based on sex. The reason for the disproportionate number of local–hire contracts going to married women, ISS explains, is that the pool of persons in Iran interested in working for the American School consisted almost entirely of spouses of Bell Helicopter and Grumman employees, nearly 100% of whom were men.

The second reason for ISS awarding ISS–sponsored and local–hire contracts as it did was the requirement of the Iranian government that benefits not be duplicated. ISS witnesses testified that the Iranian officials with whom they dealt monitored the contract between ISS and the government of Iran and sought to insure that an ISS employee did not receive extra benefits which he or his spouse were already receiving through another employer.

The third reason for ISS's policy is that if people were in Iran primarily to teach and were on ISS–sponsored contracts, ISS had a better hold on them and greater assurance that they would stay through the school year.

I conclude that these reasons, individually and in the aggregate, constituted legitimate, non-discriminatory reasons for awarding ISS–sponsored contracts only to persons whose primary purpose for being in Iran was to teach at the American School, and I also conclude that this basis for allocating ISS–sponsored and local–hire contracts had a manifest relationship to the employment in question. The fact that the sex composition of the pool of local applicants for teaching positions resulted in a disproportionate number of local–hire contracts going to married women does not alter this conclusion, *Miller v. Weber, supra; Yuhas v. Libbey–Owens–Ford Co., supra.*

However, this is not the end of the inquiry in this case. I find that ISS's method of implementing a valid policy for awarding contracts has had the effect of discriminating against plaintiffs on the basis of their sex, and that ISS has not articulated any reason, much less a legitimate non-discriminatory reason, for this method. As was described above, ISS failed to describe or disclose the basis of its policy to persons hired locally. Further, ISS ascertained the primary purpose for a person being in Iran by the simple expedient of determining if that person's spouse worked in Iran for Bell Helicopter, Grumman, or perhaps another American company. If the teacher's spouse did work for an American company in Iran, ISS assumed that the teacher's primary purpose for being in Iran was not to teach at the American School but to accompany the spouse. ISS's failure to inform its teachers or local applicants for teaching positions of the primary purpose test, prevented such a teacher from establishing her qualifications for an ISS-sponsored contract in those situations when her primary purpose for being in Iran was, in fact, to teach at the American School. These practices

necessarily had a disparate impact generally upon married women applying locally for teaching positions at the American School because at no time were they given the opportunity to establish their actual primary purpose for being in Iran or to notify ISS of any change in their purpose for being in Iran. Further, these practices resulted in disparate treatment of Lillibridge and Bryant during a part of the time they were teaching at the American School.

I find that from April, 1977 until her employment by ISS terminated, Lillibridge's primary purpose for being in Iran was to teach at the American School. In April, 1977 Lillibridge's spouse's contract with Bell Helicopter terminated and he signed up for another year in order that Lillibridge could continue teaching. Thus, his and her primary purpose for being in Iran was to enable Lillibridge to teach at the American School.

I further find that from March to June, 1977 Bryant's primary purpose for being in Iran was to teach at the American School. In March, 1977 she and her husband decided to seek a divorce, and she stayed in Iran only to complete her year with ISS. From that point on her primary purpose for being in Iran was not to be with her husband but to teach at the American School.

Neither Lillibridge nor Bryant had been informed of ISS's policy for awarding contracts, and, in fact, they had been misinformed about those policies, having been told that ISS-sponsored contracts were awarded to persons hired in the United States and that local-hire contracts were awarded to persons hired in Iran. Further, ISS made its determination of primary purpose on the basis of a sex-tainted stereotype dealing with the primary purposes of married women. By reason of ISS's practices neither plaintiff was aware that as of March or April, 1977 she was entitled to an ISS-sponsored contract, and ISS's tainted basis of judgment prevented ISS from making an appropriate change in benefits.

Thus, the method by which ISS implemented its valid contract awarding policy discriminated on the basis of sex.

It was clear from the evidence that ISS knew that Bell Helicopter's and Grumman's employees in Iran were almost all men, and that the spouses upon whom ISS would draw locally to fill vacant positions at the American School were virtually all women. It is also clear from the evidence that ISS proceeded with typical stereotypes about women in mind when it decided upon the method by which it would implement its contract-awarding policy. Its earlier personnel policies statements show that ISS's thinking was afflicted with the kind of typical sex stereotype which the United States Supreme Court has condemned, *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), and which so often leads to discriminatory action. ISS-sponsored contracts were limited to "heads of households" during the 1975–76 and 1976–77 school years. That "heads of households" originally meant husbands in the case of married couples is suggested by the 1976–77 addition to the provisions concerning pay differentials for married couples. Whereas prior to that year the extra pay was awarded to the "head of the household", in 1976–77 the provision was changed by adding the statement that "The head of the household may be either spouse." (*See* n. 5.)

Clearly indicative of reliance upon sexual stereotypes denigrating the role of women was ISS's assumption that if a female teacher's husband worked for Bell Helicopter or Grumman her primary purpose for being in Iran was not to teach at the American School but, rather, to be with her husband. As I have previously found, this assumption was wrong in the case of Bryant during and after March, 1977, and it was wrong in the case of Lillibridge during and after April, 1977.

ISS has denied that it failed to inform its locally hired married teachers about its policies for awarding contracts. Their denial is not persuasive. ISS was unable to give a consistent articulation of its policies even to itself prior to the concluding phases of this litigation. I find that it did not inform its locally hired teachers of its policies and, as previously stated, misinformed them about these policies.

■ ISS has not articulated any legitimate, non–discriminatory reasons for failing to advise its locally hired married teachers of its contract allocation policies or for determining such person's primary reason for being in Iran in the manner previously described. Further, neither the failure to inform nor the method of determining primary purpose for being in Iran had a manifest relationship to the employment in question. ISS has, therefore, failed to counter plaintiff's prima facie case of disparate treatment and disparate impact arising from the method by which it implemented its primary purpose policy in awarding contracts to local applicants for teaching positions.

### VII. Establishment of Disparate Treatment and Impact

#### A. As to Disparate Treatment

Not only has ISS failed to articulate reasons for its method of determining the primary purpose of locally hired married teachers for being in Iran, its reason for denying Bryant and Lillibridge ISS–sponsored contracts during and after March, 1977 and April, 1977, respectively, was pretextual. The evidence establishes that during those periods plaintiffs' primary purpose was to teach at the American School and that the reason that they were not given such contracts at that time was not the absence of a requisite primary purpose but, rather, ISS's tainted method of deciding entitlement to ISS–sponsored contracts.

The situation is analogous to that in *Kunda v. Muhlenberg College*, 621 F.2d 532 (3d Cir. 1980). There the Court noted that "[c]entral to the trial court's ultimate finding of disparate treatment was the difference in counseling received by male members of the Physical Education Department and by plaintiff. Although plaintiff had not been told of the necessity to have a master's degree either at the time of her initial employment at the college or by her department chairman, Dean, or President when she was being considered for promotion and tenure, male candidates for promotion and tenure were so advised", at 539.

In the present case plaintiffs, married women hired locally, were not told of the primary purpose policy, while locally hired married men (with the one exception referred to in the Findings of Fact) were given ISS–sponsored contracts. As explained above, plaintiffs were automatically given, and continued under, local–hire contracts by the utilization of procedures which were unnecessary to the accomplishment of the legitimate ends which ISS sought to achieve.

■ To establish disparate treatment, a showing of intentional discrimination must be made–a showing that ISS's practices were engaged in deliberately and not accidentally, *Kober v. Westinghouse Electric Corp.*, 480 F.2d 240, 246 (3d Cir. 1973).

■ I find that the failure to inform persons hired locally of ISS's policies and utilization of a sex–tainted criterion to determine primary purpose were purposeful and were done knowing that the persons affected were all married women. The failure to include the attachments to the plaintiffs' employment contracts, the evasiveness and misinformation which characterized ISS's oral explanations, the statistics as to the allocation of local–hire contracts, and the shifting rationalizations used by ISS to justify its policies and procedures negate any contention that its conduct was inadvertent. This evidence, all of which is discussed in more detail in earlier sections of this opinion, establishes the requisite intent, *Kunda v. Muhlenberg College, supra*, at 544–545.

#### B. As to Disparate Impact

■ Were it to be concluded that ISS had overcome plaintiffs' prima facie case of disparate impact, I would find that plaintiffs have shown that ISS could have provided locally hired married women full information about the two types of contracts and how ISS determined who was entitled to the ISS–sponsored contracts. I would also find that there were ways other than referring to a husband's employment in which ISS could have determined the pri-

mary purpose of a female married teacher for being in Iran. This could have been done without in any way obstructing ISS's policy of awarding ISS–sponsored contracts only to persons whose primary purpose for being in Iran was to teach at the American School. Thus, plaintiffs have shown that other devices without a discriminatory effect would serve ISS's legitimate interests, *Dothard v. Rawlinson, supra,* 433 U.S. at 329, 97 S.Ct. at 2726.[6] Thus, disparate impact has been established.

### C. *Injury*

 Finally, ISS's practices caused injury to plaintiffs by depriving them of extra benefits during the period when their primary purpose for being in Iran was to teach at the American School. Had they known ISS's basis for awarding extra benefits, and had ISS not employed a method of determining primary purpose which resulted in an erroneous determination with respect to plaintiffs, plaintiffs could have applied for and properly should have received the extra benefits starting in March and April, 1977. Thus, all the elements for proof of disparate treatment and disparate impact have been established by the evidence.

### VIII. *"Act of State" and "Foreign Compulsion" Defenses*

 ISS asserts that its policies and practices in awarding contracts to teachers at the American School in Isfahan were immunized from attack on Title VII grounds by the act of state doctrine and by the defense of foreign compulsion. The act of state doctrine precludes inquiry into the validity of a foreign sovereign's act and requires American courts to respect private claims based on the contention that the damaging act of another nation violates American law. *Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287, 1292–1293 (3d Cir. 1979). The foreign compulsion defense, developed in the context of antitrust litigation, shields from liability the acts of

parties carried out in obedience to the mandate of a foreign government, *Interamerican Refining Corp. v. Texaco Maracaibo, Inc.,* 307 F.Supp. 1291, 1296 (D.Del.1970).

It is ISS's contention that the conduct which lies at the heart of plaintiffs' claims was mandated by Iranian authorities, that the insistence by these authorities that ISS not pay benefits to teachers which would duplicate benefits being received by the teachers' spouses constituted an act of state and the basis of the defense of foreign compulsion.

Long before it entered into a contractual relationship with the Iranian government, ISS allocated its ISS–sponsored contracts and its local–hire contracts on the basis of the primary purpose which motivated its employees to come to or remain in Iran. Continuation of this policy after ISS began contracting with the Iranian government instead of Bell Helicopter insured compliance with the government's requirement that there be no double payments of benefits to spouses working in Iran for companies under contract with the Iranian government. Inasmuch as I have concluded that ISS's policy in this regard did not violate Title VII, there is no need to decide whether this requirement of the Iranian authorities who negotiated the contract with ISS rose to the level of an act of state.

 It was not the policy against payment of double benefits or the primary purpose basis for awarding contracts which I found violated Title VII; I found that ISS violated Title VII by failing to advise persons hired locally of its basis for awarding contracts and by determining an employee's primary purpose for being or remaining in Iran by means of criteria which had the effect of discriminating against married women. There was nothing in Iranian law and there were no requirements of the Iranian authorities which compelled ISS to conceal its policies from persons hired local-

---

6. The subjective primary purpose test is itself a difficult test to apply. There is no need, however, to determine whether some other criteria might better have accomplished ISS's purposes of avoiding double benefits and providing inducements to attract teachers to Iran without incurring the risk of discriminating against married women.

ly, or to base its determination of primary purpose on the employment status of its teachers' spouses. Those were actions and policies of ISS and neither reflected sovereign decisions of the Iranian government nor were compelled by the Iranian government. Thus those actions and policies are not protected by the act of state doctrine or the defense of foreign compulsion, *Mannington Mills, Inc. v. Congoleum Corp., supra*, at 1293; *Timberlane Lbr. Co. v. Bank of America, N.T. & S.A.*, 549 F.2d 597, 608 (9th Cir. 1976).

### IX. *Damages*

Reinstatement is not an available remedy in this case, and under the circumstances plaintiffs can be made whole for the injuries suffered on account of the unlawful employment discrimination by an award of damages. The awards will consist of the amounts they should have been paid under an ISS–sponsored contract during the periods when their primary purpose for being in Iran was to teach at the American School. *Jurinko v. Edwin L. Wiegand Company*, 477 F.2d 1038, 1046 (3d Cir. 1973). In the case of Bryant, that period will be March through June, 1977. In the case of Lillibridge, that period will be April, 1977 through June, 1978. They are not entitled to the extra benefits for prior periods because even if ISS had advised plaintiffs of their contract policies and even if ISS had used a proper method of determining their primary purpose for being in Iran plaintiffs would not have been entitled to an ISS–sponsored contract.

Bryant will be awarded damages as follows:

(i) An amount equal to 25% of her base pay for the months of March through June, 1977.

(ii) An amount equal to the value of housing which ISS would have provided a single teacher under an ISS–sponsored contract for the months of March through June, 1977. Since Bryant and her spouse decided to seek a divorce in March, 1977, it is reasonable to conclude that had Bryant had an ISS–sponsored contract she would have commenced living separately from her spouse at that time.

(iii) The sum of $600, representing $150 per month for personal transportation for the months of March through June, 1977.

Lillibridge will be awarded damages as follows:

(i) An amount equal to 25% of her base pay for the months of April through June, 1977 and for the 1977–78 school year.

(ii) The sum of $2250, representing $150 per month for personal transportation for the period from April 1, 1977 through June 30, 1978.

I am not awarding any amounts representing relocation costs both because Bryant and Lillibridge received equivalent payments under their husbands' employment contracts and also because, as I have previously found, their primary purpose for moving to Iran in the first instance was not to work at the American School and thus they were not entitled to such payments at that time. I am not awarding Lillibridge an amount representing a housing allowance, an annual allotment for shipment of goods, or a summer recess trip to and from the United States because Lillibridge, who was still married to her husband, received the equivalent of these items under his contract. She testified that in the summer of 1977 she returned to the United States and also travelled extensively abroad.

If the parties cannot agree upon the exact amount of the judgment to be entered in accordance with the above criteria, they should move to settle the form of judgment and furnish the Court with affidavits or other evidence supporting the amounts they believe to be appropriate.

If plaintiffs' attorneys contemplate applying for attorneys fees, pursuant to 42 U.S.C. § 2000e–5(k), I direct their attention to *White v. New Hampshire Dept. of Employment Security*, 629 F.2d 697 (1st Cir. 1980), which holds that attorneys fees under 42 U.S.C. § 1988 must be applied for within ten (10) days of the entry of judgment. This may not represent the rule in the

Third Circuit in either civil rights or employment discrimination cases, but until that question is resolved it might be well to meet the deadline specified in *White*.

Judgment in the appropriate amounts will be entered in favor of plaintiffs and against defendant without interest but with costs against defendant.

Appendix A

Chart No. 1

| | | School Years | |
|---|---|---|---|
| | | 1977–78 | 1978–79 |
| 1. | Number of persons holding ISS-sponsored contracts in this year | 142 | 162 |
| 2. | Number of Females (% of Total) | 71 (50%) | 82 (50%) |
| 3. | Number of Males (% of Total) | 71 (50%) | 80 (50%) |
| 4. | Total Number of persons who had their dossiers sent to the American School during the 12 month period prior to the school year. | 216 | 270 |
| 5. | Number of Females in No. 4 above (% of Total) | 103 (48%) | 139 (51.5%) |
| 6. | Number of Males in No. 4 above (% of Total) | 113 (52%) | 131 (49.5%) |
| 7. | Adverse Impact Analysis | | |
| | Standard Deviation | 6.0 | 6.4 |
| | Acceptable Range for Female Selections | 67.7 ± 12.0 | 83.3 ± 12.8 |
| | Is there adverse impact in selection of females for ISS-sponsored staff positions. | No | No |

Appendix B

Chart No. 2

| | | School Years | | |
|---|---|---|---|---|
| | | 1976–77 | 1977–78 | 1978–79 |
| 1. | Number of persons holding ISS-sponsored contracts in this year | 107 | 142 | 162 |
| 2. | Number of Females (% of Total) | 54 (50%) | 71 (50%) | 82 (51%) |
| 3. | Number of Males (% of Total) | 53 (50%) | 71 (50%) | 80 (49%) |
| 4. | Total Number of persons who had the opportunity to have dossiers sent to the American School during the 12 month period prior to the school year. | 405 | 410 | 514 |

| | | School Years | | |
|---|---|---|---|---|
| | | 1976–77 | 1977–78 | 1978–79 |
| 5. | Number of Females in No. 4 above (% of Total) | 189 (47%) | 198 (48%) | 281 (55%) |
| 6. | Number of Males in No. 4 above (% of Total) | 216 (53%) | 212 (52%) | 233 (45%) |
| 7. | Adverse Impact Analysis | | | |
| | Standard Deviation | 5.2 | 6.0 | 6.3 |
| | Acceptable Range for Female Selections | 49.9 ± 10.4 | 68.6 ± 12.0 | 88.6 ± 12.6 |
| | Is there adverse impact in selection of females for ISS-sponsored staff positions. | No | No | No |

Appendix C

Chart No. 3

| | | School Years | | | |
|---|---|---|---|---|---|
| | | 1975–76 | 1976–77 | 1977–78 | 1978–79 |
| 1. | Number of persons holding ISS-sponsored contracts in this year | 65 | 107 | 142 | 162 |
| 2. | Number of Females (% of Total) | 33 (50.7%) | 54 (50%) | 71 (50%) | 82 (51%) |
| 3. | Number of Males (% of Total) | 32 (49.3%) | 53 (50%) | 71 (50%) | 80 (49%) |
| 4. | Total Number of persons who became newly active candidates for placement by ISS referral service during the 12 month period prior to this school year. | 452 | 404 | 606 | 300 |
| 5. | Number of Females in No. 4 above (% of Total) | 248 (55%) | 200 (50%) | 321 (51%) | 149 (50%) |
| 6. | Number of Males in No. 4 above (% of Total) | 204 (45%) | 204 (50%) | 294 (49%) | 151 (50%) |

| | School Years | | | |
| --- | --- | --- | --- | --- |
| | 1975–76 | 1976–77 | 1977–78 | 1978–79 |
| 7. Adverse Impact Analysis | | | | |
| Standard Deviation | 4.0 | 5.2 | 6.0 | 6.4 |
| Acceptable Range for Female Selections | $35.7 \pm 8.0$ | $53.0 \pm 10.4$ | $75.2 \pm 12.5$ | $80.5 \pm 12.8$ |
| Is there adverse impact in selection of females for ISS-sponsored staff positions. | No | No | No | No |