Dorothy I. YUHAS and Nancy Anderson,
Plaintiffs-Appellees,

v.

LIBBEY–OWENS–FORD COMPANY,
Defendant-Appellant.

No. 77–1143.

United States Court of Appeals,
Seventh Circuit.

Argued June 10, 1977.

Decided Sept. 28, 1977.

Rehearing and Rehearing En Banc
Denied Dec. 2, 1977.

Charles J. Griffin, Jr., Chicago, Ill., for defendant-appellant.

Alvin L. Kruse, Chicago, Ill., for plaintiffs-appellees.

Before SWYGERT, SPRECHER and TONE, Circuit Judges.

SWYGERT, Circuit Judge.

We must decide whether an employer's rule that a present employee's spouse may not be hired in a similar capacity violates the antidiscrimination provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. The district court found a violation. We take a contrary view and reverse.

I

Defendant Libbey-Owens-Ford Company operates two plants in Ottawa, Illinois.

The company has a rule against hiring an hourly employee at these plants when the applicant's spouse is already employed there in the same capacity. The rule was promulgated at the Ottawa plants on July 1, 1968 as an extension of a company policy which has been in effect since before 1953. The rule is directed only to the hiring of new employees, whether male or female. It does not require discharging either spouse of couples already married on July 1, 1968, and does not require terminating an employee who marries a fellow employee.

On June 30, 1969, plaintiff Dorothy I. Yuhas applied for employment as an hourly employee at defendant's Ottawa plants. Her application was denied, pursuant to the no-spouse rule, because her husband was then employed as an hourly employee at one of those plants.

Contending that she was the victim of sexual discrimination, Yuhas filed charges against defendant with the Equal Employment Opportunity Commission on August 15, 1969. The gravamen of her claim was that the no-spouse rule had a discriminatory effect because since its inception seventy-one women, compared to three men, had been denied employment for the reason that their spouses were already employed as hourly employees. Yuhas obtained a right-to-sue letter from the EEOC on June 2, 1972, and filed this action in the District Court for the Northern District of Illinois on August 22, 1972. The court permitted Nancy Anderson, who was denied employment pursuant to the no-spouse rule in August 1972 and received a right-to-sue letter on May 23, 1973, to join the action as a party-plaintiff on May 30, 1973. Plaintiffs maintained the action on behalf of themselves and the class of all similarly situated women.

After discovery and the reassignment of the case to a new district judge, each side moved for summary judgment on January 12, 1976. The district court found that although the no-spouse rule was sexually neutral on its face, it had "a greatly disparate impact" under *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158

(1971). The court held plaintiffs had therefore made out a prima facie case for relief. This prima facie case could be rebutted only if defendant could show that the rule was job-related. The court found that there was a question of fact as to whether the rule was job-related which could only be resolved by a trial. 411 F.Supp. 77 (N.D.Ill. 1976).

At a bench trial, defendant attempted to demonstrate that the no-spouse rule served a legitimate, business-related function. It introduced evidence that hourly workers who are married to each other are absent from work or tardy in appearing for work more often than other workers. It also tried to show that the employment of both partners in a marriage led to problems in the scheduling of vacations and work assignments because both partners often wanted the same vacation and work assignment. Finally, it presented testimony that the employment of both spouses undermined employee morale and efficiency because the relationship between the spouses interfered with the ordinary relationships workers have with each other and with their supervisors.

On December 15, 1976, the district court held that the evidence introduced by defendant was insufficient to rebut plaintiffs' prima facie case. It found the statistical evidence of absenteeism and tardiness to be unconvincing, and rejected the validity of the other testimony presented by defendant on the ground that there was "no hard information as to what specific production problems were ever caused in any particular case." Accordingly, the court enjoined defendant from continuing to maintain its no-spouse rule.

Defendant now appeals. It contends both that the district court erred in holding that plaintiffs had made out a prima facie case of employment discrimination and that, in any event, the no-spouse rule is job-related.

II

■ Defendant's argument that the district court erred in holding that plaintiffs

had established a prima facie case is based on the claim that *Griggs*, which was a case of racial discrimination, should not be extended to cases of sexual discrimination. It contends, relying on *General Electric v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), that an employment rule which is not based on gender is not sexually discriminatory within the meaning of Title VII, regardless of whether the rule has a discriminatory impact.

We cannot accept this argument. In the recent case of *Dothard v. Rawlinson*, —— U.S. ——, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), the Supreme Court expressly extended *Griggs* to a case of sexual discrimination. Alabama had a rule requiring all state prison guards to be at least five feet, two inches tall and to weigh at least 120 pounds. The rule excluded 41.13 percent of the female population in the United States while excluding less than one percent of the male population. The Court held that these statistics alone, without a showing of discriminatory intent, were sufficient to make out a prima facie case of *unlawful sexual discrimination*. It stated:

> The gist of the claim that the statutory height and weight requirements discriminate against women does not involve an assertion of purposeful discriminatory motive. It is asserted rather, that these facially neutral qualification standards work in fact disproportionately to exclude women from eligibility for employment by the Alabama Board of Corrections. We dealt in *Griggs v. Duke Power Co., supra*, and *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280, with similar allegations that facially neutral employment standards disproportionately excluded Negroes from employment, and those cases guide our approach here.

> Those cases make clear that to establish a prima facie case of discrimination, a plaintiff need only show that the facially neutral standards in question select applicants for hire in a significantly discriminatory pattern. Once it is thus shown that the employment standards are discriminatory in effect, the employer must

meet "the burden of showing that any given requirement [has] . . . a manifest relation to the employment in question." *Griggs v. Duke Power Co.*, 401 U.S. at 432 [91 S.Ct. 849, at 854], 97 S.Ct. at 2726 (footnote omitted).

*Dothard* governs the case at bar. Like the Alabama rule, defendant's no-spouse rule is not gender-based and does not intentionally discriminate against women. But again like the Alabama rule, the no-spouse rule has a substantial discriminatory impact which is demonstrated by the statistic that seventy-one of the last seventy-four people disqualified under it were women. It therefore is invalid under Title VII unless defendant can show that it is job-related. *See also United States v. City of Chicago*, 549 F.2d 415, 427 (7th Cir. 1977).

We do not find this result to be at odds with *General Electric v. Gilbert*. The plaintiffs in *General Electric* challenged the validity of the company's disability plan which excluded disability benefits arising from pregnancies. The Court held that the plan did not violate Title VII for two reasons: first, because it was not gender-based and therefore did not intentionally discriminate against women; and second, because plaintiffs had not made a showing that the plan would have a discriminatory impact. 429 U.S. at 133–40, 97 S.Ct. 401. The Court in no way intimated that *Griggs* would not be applicable if plaintiffs had been able to demonstrate that the plan had a discriminatory impact. Moreover, even if isolated language in the *General Electric* opinion could be read as *sub silentio* overruling *Griggs* or restricting it to cases of racial discrimination, *see* 429 U.S. at 153, 97 S.Ct. 401 (Brennan, J., dissenting), the Court's square holding in the more recent *Dothard* case prohibits such an interpretation.

### III

■ We therefore turn to a determination of whether the no-spouse rule is job-related. The district court held that defendant failed to satisfy its burden of proof on this issue. The court first found that de-

fendant failed to demonstrate by statistical evidence that its rule was necessary to prevent excessive absenteeism or tardiness, or that without the rule the scheduling of vacation and work assignments would be more difficult. This finding is not clearly erroneous and we affirm it on appeal.

The court also rejected defendant's assertion that the rule prevented situations which could undermine employee morale and efficiency. The court found that defendant had not proved this assertion because it had not shown that production would fall if the rule were discarded. We cannot argue with the factual predicate of this statement, for there is no evidence in the record linking the rule and production in defendant's Ottawa plants.

■ However, unlike the district court, we do not find that these facts conclusively demonstrate that the rule was not job-related. The no-spouse rule is predicated on the assumption that it is generally * a bad idea to have both partners in a marriage working together. There are a number of reasons why this assumption is plausible. First, the marital relationship often generates intense emotions which would interfere with a worker's job performance. The typical employee is often able to temporarily put aside these emotional feelings when he or she goes to work because the work environment is sharply differentiated from the home environment. This distinction becomes impossible if the employee's spouse is also his or her coworker.

Second, if an employee who works with his or her spouse became involved in a grievance with the employer or another worker, the two spouses might be expected to take the same side in the dispute. This factor could hamper the expeditious resolution of grievances.

Third, if both partners in a marriage were employed together, and one spouse was promoted to a supervisory position, numerous problems could arise. One spouse might resent the other's promotion, preventing the promoted worker from efficiently performing his or her new job. The person in the supervisory position might have a great deal of difficulty in imposing discipline on or otherwise exercising authority over his or her spouse. Moreover, the other workers who were placed under the authority of the higher-ranking partner might resent the "advantage," which his or her spouse received, whether or not the supervisor in fact favored his or her spouse.

Finally, a no-spouse rule eliminates the possibility of the already-employed marriage partner intervening in the hiring process on behalf of his or her spouse, to the detriment of the employer and any more qualified persons who did not obtain the job because of this intervention.

It would be hard to prove that any of these reasons for maintaining a no-spouse rule are valid in the sense that, without the rule, production would fall. Our devices for measuring industrial efficiency and morale are not so finely tuned that they can easily make such a determination. On the other hand, these reasons are far from frivolous. They correspond to the reasons which have led a number of institutions to conclude that family members should not work in the same environment. The movement to a sharp dichotomy between the workplace and the home may not in the long run prove to be a fruitful one, but it has become widely prevalent in our society.

We are therefore left in a difficult situation. Defendant cannot statistically prove that its rule increases production, but its arguments that the rule "improves" the workplace are convincing. In our judgment the solution to this problem lies in examining the animating spirit behind the *Griggs* rule. The *Griggs* Court stated: "We do not suggest that either the District Court or the Court of Appeals erred in

---

* Plaintiffs argue that we should not permit defendant to maintain the no-spouse rule because it has not extended the rule to its executives. We cannot accept this reasoning. Defendant is under no obligation to be consistent in its company policy. By not extending the no-spouse rule to executives, defendant loses whatever benefits the rule confers. But that is a matter of policy for defendant to decide.

examining the employer's intent; but good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability." 401 U.S. at 432, 91 S.Ct. at 854. The rule which *Griggs* laid down later in the opinion—that an employment practice with a discriminatory impact is invalid unless it is job-related—must be examined in light of this earlier statement.

The no-spouse rule in this case does not operate as a "built-in headwind" for women. It is unlike the requirement in *Griggs* that an employee have a high school diploma, or a rule that only the top-ranking contestants on a standardized test will be selected for employment, *see United States v. City of Chicago*, 549 F.2d 415 (7th Cir. 1977), or the rule in *Dothard* that only people of a certain size may be hired. These employment tests all had a discriminatory impact because they focused on personal characteristics which members of a minority group were not as likely to possess, given their environmental or genetic background, as other job applicants. The no-spouse rule, on the other hand, does not place women at a disadvantage because they failed to develop certain personal characteristics as a consequence of their environmental or genetic backgrounds. Rather, the rule's discriminatory impact is the result of the historical fact that in the past far more men than women chose to work in defendant's Ottawa plants, with the result that substantially more than half of the employees in those plants are now men. Defendant asserts, and there is nothing in the record contradicting its assertion, that in some of its other plants historical circumstances operated differently and there is a majority of female workers. In those plants, the no-spouse rule, which is in effect on a company-wide basis, has a discriminatory impact on men.

This would be a different case if plaintiffs had shown that defendant historically employed more men than women in its Ottawa plants because it intentionally discriminated against women. There is no evidence in the record supporting such a finding, however, and we must assume that the present disparity between men and women in the Ottawa plants was the result of noninvidious factors.

Because the no-spouse rule plausibly improves the work environment, and because it does not penalize women on the basis of their environmental or genetic background, we hold that the rule is job-related. We therefore conclude that it does not violate Title VII.

The judgment of the district court is reversed and the cause is remanded for further proceedings consistent with this opinion.