**Dottie D. Jernigan BRYANT and Theresa O. Lillibridge, Appellants in No. 81–1558,**

v.

**INTERNATIONAL SCHOOLS SERVICES, INC., Appellant in No. 81–1559.**

**Nos. 81–1558, 81–1559.**

United States Court of Appeals, Third Circuit.

Argued Nov. 17, 1981.

Decided March 31, 1982.

---

**9.** We need not decide whether the notice to PN of the September 24 hearing was sufficient.

Yvette Weiss, Trenton, N. J., for appellants, Dottie D. Jernigan Bryant and Theresa O. Lillibridge.

Kenneth McCullough, McCarthy & Hicks, Princeton, N. J., for Intern. Schools Services, Inc.; Townley & Updike, New York City, of counsel.

Before GIBBONS and HIGGINBOTHAM, Circuit Judges, and McCUNE, District Judge.*

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

This is an appeal from the decision of the district court entered in a sex discrimination action brought by two teachers, Dottie Jernigan Bryant (Bryant) and Theresa O. Lillibridge (Lillibridge) against International Schools Service, Inc. (ISS). Bryant and Lillibridge, who had been employed by ISS at the American School in Isfahan, Iran, alleged in their suit that ISS's policy of awarding two different employment contracts with unequal benefits to persons hired to work in Iran constituted sex-based discrimination in violation of Title VII of

---

* Honorable Barron P. McCune, United States District Judge for the Western District of Pennsylvania, sitting by designation.

the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). After a trial on the merits, the district court held that: (1) Title VII is applicable to ISS's employment practices in Iran; (2) appellants had established a *prima facie* case of sex discrimination in violation of Title VII under both the disparate impact and disparate treatment theories; and (3) although ISS had legitimate, non-discriminatory reasons for its dual contract policy and its policy had a manifest relationship to the employment in question, the method by which ISS implemented its policy unlawfully discriminated against appellants on the basis of their sex. *Bryant v. International Schools Services, Inc.,* 502 F.Supp. 472 (D.N. J.1980). In a final judgment entered February 17, 1981, Bryant was awarded $3,437.50 and Lillibridge, $6,568.75. Total costs of $1,483.36 were also awarded to both appellants, and attorney's fees of $28,000 to their attorney. Bryant and Lillibridge and ISS appeal from the district court's decision.[1]

This case raises significant questions regarding the applicability of Title VII to the overseas employment practices of a private American employer and the scope and meaning of that statute's proscription against sex-based discrimination in employment. Appellants' challenge to ISS's overseas contract policy vividly demonstrates how an increasing patina of subtlety and complexity has obscured alleged claims of sex discrimination. Here the defendant, ISS, admittedly hired persons to teach in Iran without regard to sex. And it admittedly awarded the more lucrative of the two employment contracts it offered teachers to a higher percentage of females than males. The problem, from appellants' perspective, however, is that a disproportionate number of the less munificent contracts went to married women living in Iran because of their husbands' employment with American companies in Iran. Having been members of this latter group, appellants now allege that such a result runs afoul of the statutory commands of Title VII.

Though we are sensitive to the salutary command of Congress that Title VII be used to compel the "removal of artificial, arbitrary and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification," *Griggs v. Duke Power Company,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971), and to prevent the perpetuation of discriminatory treatment based on sexual stereotypes,[2] we find that appellants' claims constitute a novel extension of the scope and meaning of Title VII's prohibition against sex discrimination in employment. Because we do not believe that the appellants have shown how appellee's contract policy impermissibly discriminated against, limited, segregated or classified appellants because of their sex,[3] we now reverse.

## I.

The facts in this case are largely undisputed and have been thoroughly and care-

---

1. Bryant and Lillibridge, appellants in No. 81–1558, will hereafter be referred to as the "appellants"; ISS, appellant in No. 81–1559, will hereafter be referred to as the "appellee."

2. *See Sprogis v. United Air Lines, Inc.,* 444 F.2d 1194, 1198 (7th Cir.), *cert. denied,* 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971), wherein the court comments that Title VII is not confined to explicit discriminations based "solely" on sex. In a footnote to its comment, the court notes that "Congress specifically rejected an amendment to the Act which would have so limited the force of the prohibition against sex discrimination. Such a limitation, it was felt, would emasculate the Act. See 110 Cong.Reg. 2728, 13, 825." 444 F.2d at 1198 n.4.

3. 42 U.S.C. § 2000e–2 (emphasis added) provides in pertinent part:

   (a) It shall be an unlawful employment practice for an employer—

   (1) to fail or refuse to hire or to discharge any individual, or otherwise to *discriminate* against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, *sex,* or national origin; or

   (2) to *limit, segregate,* or *classify* his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, *sex,* or national origin.

fully set forth by the trial court in *Bryant*, 502 F.Supp. at 474–80. We include a detailed summary of them here because of the nature and extent of the claims before us.

## A. ISS AND THE AMERICAN SCHOOL

ISS is a private, nonprofit corporation organized under the laws of the District of Columbia. From its headquarters in Princeton, New Jersey it contracts with overseas governments and corporations to provide comprehensive educational services for the children of Americans employed abroad. Its services include staffing and operating schools, educational consultation, purchasing and procurement of materials and supplies, and financial management.

Pursuant to a contract with Bell Helicopter International, ISS established the American School in Isfahan, Iran (the "American School" or "School") in 1973. The contract called for ISS not only to establish a school comprised of grades kindergarten through twelve, but also to hire and supervise all school staff. Although the school was set-up under ISS's contract with Bell Helicopter, it was open to the overseas employees of other companies per arrangements between those companies and Bell Helicopter. Beginning in 1976, ISS contracted directly with the Iranian government to operate the school on a cost plus basis. Revolutionary turmoil in Iran forced the permanent closing of the school on January 6, 1979.

From its inception in 1973, the American School was staffed primarily by teachers hired through the ISS referral service in Princeton, New Jersey. Additional teachers, if needed, were recruited from among Americans already living in Iran. Since the wives of Grumman Aerospace Corporation and Bell Helicopter employees constituted the largest pool of unemployed Americans, teachers hired locally were usually women.

## · B. ISS'S DUAL CONTRACT POLICY

The essence of appellants' case is rooted in ISS's policy of awarding its teaching staff at the American School two different contracts. The two contracts, known as ISS-sponsored and local-hire contracts, had substantially different benefits beyond those common to all staff.[4] An ISS-sponsored contract was offered to all teachers hired through the ISS referral service in Princeton, New Jersey. Those hired in Isfahan received either an ISS-sponsored contract or a local-hire contract. Teachers awarded the more desirable ISS-sponsored contracts received eleven additional benefits not given to those awarded local-hire contracts.[5]

---

**4.** Certain policies and benefits applied to all staff and are not at issue in this case. Regardless of the type of contract, all teachers performed the same duties and were hired for the September through June school term. Base salary was set according to teaching experience and educational attainment. Other common benefits included: a continuity incentive of 15% of base salary after three years of service and for each year thereafter; ISS-paid major medical insurance, life insurance, and long-term disability insurance; voluntary participation in a TIAA/CREF retirement plan in which a minimum 5% of base salary staff contribution was matched by a 10% contribution by ISS; and voluntary participation in Blue Cross/Blue Shield with the cost of the premiums split equally between the staff member and ISS.

**5.** The additional benefits included:

(1) A monthly overseas allowance equal to 25% of base salary. (Prior to September, 1978, only one member of a teaching couple could receive this additional allowance. After that date it was available to all staff with ISS-sponsored contracts. All other additional allowances received by a family unit were the same regardless of the number of family members with ISS-sponsored contracts.)

(2) A monthly transportation allowance of $150.

(3) Reimbursement for costs of initial travel to Iran, including transportation, and fees for passports and medical examinations.

(4) A one-time allowance to ease relocation in Iran.

(5) A shipping allowance for initial relocation, and a small annual shipping allowance thereafter.

(6) Transition costs, including hotel or motel expenses and a per diem allowance for approximately one month.

(7) A housing allowance, including utilities, or actual housing.

(8) Round-trip fare for an annual trip home to the United States for a staff member and his or her dependents.

ISS's personnel policies included specific reference to its dual contract policy.[6] Although ISS-sponsored contracts were variously termed expatriate or foreign contracts, the policies made clear that, whatever their name, those contracts were reserved for only persons "sponsored" by ISS.[7]

Between 1975 and 1979 when either one or both appellants were teaching at the

(9) Round-trip fare to the United States in the event of a family death.

(10) Round-trip air fare for college-age children—annually for a four-year period.

(11) An annual allowance of $500 for storage of household goods at home.

**6.** During those years in which one or both appellants were employed by ISS, ISS included the following statements in its personnel policies.

1975–76:

*Benefits and Allowances Contracts*—Two types of contracts are used, (1) expatriate and (2) local hire. A two-year expatriate contract is offered to International Schools Services sponsored heads-of-household employed in the United States or an overseas location, including Iran. A one-year contract is offered to locally hired teachers who are not ISS sponsored. Extension of contracts for an unlimited number of years is possible.

1976–77:

IV. *ISS Isfahan Personnel Policies—General*
  A. *Contracts*—Two types of contracts are used, (1) foreign and (2) local hire. A two-year foreign contract is offered to International Schools Services sponsored heads-of-household employed in the U. S. or an overseas location, including Iran. A one-year contract is offered to locally hired teachers who are not ISS sponsored. Extension of contracts for an unlimited number of years is possible.

1977–78:

#### GENERAL INFORMATION

A. ISS sponsored staff designates members of the ASI professional staff which ISS has recruited and employed in the United States or abroad to specifically fill a position at ASI. In addition to these staff members ISS employs persons who are sponsored by other organizations and who possess the qualifications to be members of the professional staff. Both ISS sponsored staff and staff employed in Isfahan are on the same salary scale. However, staff employed in Isfahan sponsored by organizations other than ISS do not receive any of the foreign service allowances.

American School, 98 local-hire contracts and 476 ISS-sponsored contracts were awarded. Ninety-seven of the local-hire contracts went to married females, one to a married male.[8] Two hundred forty (50.42%) of the ISS-sponsored contracts were awarded to women, 92 to married females, 148 to single females. Two hundred thirty-six ISS-sponsored contracts went to males (49.58%), 156 to married males, 80 to single males.[9]

V. *ISS Isfahan Personnel Policies—General*
  A. *Contracts*—Two types of contracts are used: (1) foreign and (2) local hire. A one year foreign contract is offered to International Schools Services sponsored staff employed in the United States or an overseas location, including Iran. A one year contract is offered to locally hired teachers who are not ISS sponsored. Extension of annual contracts for an unlimited number of years is possible.

1978–79:

V. *ISS Isfahan Personnel Policies—General*
  A. *Contracts*—Two types of contracts are used: (1) ISS sponsored, and (2) ISS Isfahan hire. A one-year foreign contract is offered to International Schools Services sponsored staff employed in the United States or an overseas location, including Iran. A one-year contract is offered to teachers who are ISS sponsored. Extension of annual contracts for an unlimited number of years is possible.

The policies also stated that "no allowances will be paid to staff members who may be locally hired in Isfahan, and who are sponsored by other agencies, companies or institutions." Appellants' Appendix at 53, 60, 66, 71.

**7.** Persons wishing to reside and work in Iran could only do so if sponsored to the Iranian government by a government-approved organization or institution. Sponsorship of a person and his dependents was usually undertaken by a person's employer.

**8.** A local-hire contract was awarded to one male during the 1976–77 school term because his qualifications were deficient. Thereafter, however, he received ISS-sponsored contracts. 502 F.Supp. at 479 n.2.

**9.**

Table I

Distribution of Local-Hire and
ISS-Sponsored Contracts, 1975–79

|         | Local Hire | ISS-Sponsored |
|---------|------------|---------------|
| 1975–76 | 15         | 65            |
| 1976–77 | 25         | 107           |
| 1977–78 | 28         | 142           |
| 1978–79 | 30         | 162           |
|         | 98         | 476           |

## C. BRYANT AND LILLIBRIDGE

The appellants in this case were among the 97 teachers hired by ISS under local-hire contracts to teach in the American School in Isfahan. Bryant, an elementary school teacher, initially sought a teaching position through ISS's referral service in Princeton, N. J. in 1975. This was done in the expectation of accompanying her husband to Iran where he was to work for Grumman. She was told at that time that no teaching positions were available, but was advised to recontact ISS when she arrived in Iran.

After her arrival in Isfahan in November 1975, Bryant was hired by ISS as a substitute teacher for the American School. Her full-time employment under a local-hire contract began in April 1976. This contract provided the benefits which were extended to all teachers, but included none of the extra benefits provided in an ISS-sponsored contract.[10] The district court found that when Bryant was hired, she was not informed that there were two kinds of contracts or shown the School's personnel policies. When she later became aware of the additional benefits and made inquiries about them, she was informed by the School that she would not receive them.

Bryant renewed her contract with ISS in October, 1976. As with her previous one, it too was a local-hire contract. In March, 1977, Bryant and her husband, Marc Jernigan, decided to separate and seek a divorce. She completed the 1976–77 school term, then returned to the United States.

Lillibridge, who was living in Iran with her husband, a pilot with Bell Helicopter, first sought a teaching position with ISS in the summer of 1975. It was not until October, 1975, however, that she was hired by ISS as a sixth grade teacher for the American School in Isfahan. Like Bryant she received a local-hire contract, and like Bryant, she was not informed that there was another type of contract or shown the School's personnel policies.

When Lillibridge made inquiries about the additional benefits which some teachers were receiving, she was told by the School that those allowances were only offered to persons hired in the United States and not to persons like herself who were hired in Iran. At a faculty meeting in 1978, ISS explained that the additional benefits paid under the ISS-sponsored contracts were not paid to persons hired locally because the latter received the additional benefits through their husbands' employment contracts.

Lillibridge renewed her teaching contract for the 1976–77 and 1977–78 school terms, each time signing a local-hire contract. She took an approved leave of absence in 1978–79. Her expected return to teaching in Isfahan in the fall of 1979 was prevented by the revolution in Iran.

Although his original contract with Bell Helicopter terminated in April, 1977, Lillibridge's husband extended his commitment to Bell so that she could continue teaching in Iran at least through the 1977–78 term. Benefits received by Lillibridge's husband through his contract with Bell were the equivalent of some of the additional allowances received under an ISS-sponsored contract but, like Bryant, at no time during her employment with ISS did Lillibridge receive the additional benefits from ISS.

Table II

Distribution of Local-Hire Contracts by Sex and Marital Status, 1975–79

|         | Married Females | Single Females | Married Males | Single Males |
|---------|-----------------|----------------|---------------|--------------|
| 1975–76 | 15              | 0              | 0             | 0            |
| 1976–77 | 24              | 0              | 1             | 0            |
| 1977–78 | 28              | 0              | 0             | 0            |
| 1978–79 | 30              | 0              | 0             | 0            |
|         | 97              | 0              | 1             | 0            |

Table III

Distribution of ISS-Sponsored Contracts by Sex and Marital Status, 1975–79

|         | Married Females | Single Females | Married Males | Single Males |
|---------|-----------------|----------------|---------------|--------------|
| 1975–76 | 13              | 20             | 25            | 7            |
| 1976–77 | 19              | 35             | 36            | 17           |
| 1977–78 | 24              | 47             | 44            | 27           |
| 1979–80 | 36              | 46             | 51            | 29           |
|         | 92              | 148            | 156           | 80           |

10. Some of the extra benefits did in fact redound to Bryant through her husband's employment with Grumman but none were provided in her contract with ISS.

## D. THE CASE BELOW

Appellants brought this Title VII action in the federal district court of New Jersey in October, 1978. Alleging that they had been the victims of unlawful sex discrimination, each sought monetary damages for benefits which they believe were wrongfully denied them by ISS's differential allowance policy.[11]

At trial, Bryant and Lillibridge contended that ISS's differential allowance policy discriminated against them and other married women living in Iran by denying to them the more lucrative ISS-sponsored contracts. They charged that because they received unequal benefits, ISS's hiring practices in Isfahan,[12] constituted discriminatory treatment on the basis of sex and resulted in a disparate impact upon married women. 502 F.Supp. at 483.

After a bench trial, the district court determined, in response to appellee's assertions to the contrary, that it had appropriately exercised subject-matter jurisdiction. It concluded that congressional intent and a fair interpretation of the statutory language supported the extraterritorial application of Title VII to ISS's policies and practices in Iran.

The district court then went on to find that appellants had established a *prima facie* case of unlawful sex discrimination. It found support for its conclusion that married women with credentials and qualifications equal to those of married men were disproportionately awarded the less desirable local-hire contracts in the statistical data—97 out of 98 local-hire contracts were awarded to married women. Other factors, the trial court concluded, supported this statistical evidence of discriminatory treatment. The trial court found that: (1) appellants were not given complete and accurate information about benefits or contract policies; (2) language changes in the personnel policies reflected superficial rather than substantive efforts to change suspect policies; and (3) a clear and consistent rationale for awarding contracts was never advanced by ISS,[13] despite what was stated in ISS's personnel policies. It concluded that ISS used a subjective "primary purpose" test to determine which contract a teacher was awarded. Teachers who went to or stayed in Iran for the primary purpose of teaching at the American School received ISS-sponsored contracts. All others received local-hire contracts.

---

11. Appellants' original complaints asserted class action allegations and sought declaratory and injunctive relief. The district court granted, without objection, ISS's motion to dismiss those claims after the American School in Isfahan closed in January, 1979.

12. Appellants did not challenge the hiring practices of ISS's stateside referral system which the trial court noted hired teachers for Iran in a nondiscriminatory manner. 502 F.Supp. at 483. In their briefs to this court appellants state that the operation of the referral system was never at issue and is irrelevant since persons like themselves who received local-hire contracts were not hired through the referral system. Appellants' Reply Brief at 24–25.

13. The trial court noted that between 1975 and the final stages of trial various criteria for awarding contracts were advanced by ISS. Appellant Lillibridge was told during her tenure in Iran that the type of contract a teacher received depended upon where she was hired: persons hired in the U. S. received ISS-sponsored contracts, those hired in Iran local-hire contracts. Although factually incorrect, this "place of hire" rationale was also the explanation given by ISS's attorneys to the Equal Employment Opportunity Commission (EEOC) during the latter's investigation of appellants' claims in 1977.

In deposition testimony, ISS posited that ISS-sponsored contracts were given only to persons who were in Iran for the convenience of ISS or for the purpose of teaching at the American School and who were sponsored in Iran by ISS. At trial, ISS attributed its policy to the Iranian government. When the spouse of a teacher was also employed by a company having a cost-plus contract with the Iranian government, ISS was prohibited from offering additional benefits which duplicated those received by their spouse from his or her company. ISS's final word on the subject, a variant of the "primary purpose" standard, reflected its personnel policies: ISS-sponsored contracts were offered only to persons ISS brought to or retained in Iran, i.e. sponsored to the Iranian government.

The disparate impact of ISS's dual contract policy, the trial court held, was demonstrated by the same factors and statistical data which supported a finding of disparate treatment.

In the present case there exist not only the actual figures showing the disproportionate number of local-hire contracts received by married women, but there also exists the fact that the records of local applications are unavailable and the various circumstances which led me to conclude that plaintiffs have established a prima facie case of disparate treatment. In the light of all these circumstances, I conclude that plaintiffs have established a prima facie case of disparate impact.

502 F.Supp. at 486.

The district court then found, however, that ISS had advanced "very persuasive reasons" for its dual contract policy: (1) Extra benefits were necessary to recruit and reward people for going to Iran and remaining there to teach. Persons in Iran for other reasons did not require enticement or extra compensation; (2) the Iranian government required that benefits not be duplicated and monitored its contract with ISS to insure that an ISS employee did not receive extra benefits paid his or her spouse by another employer; and (3) the extra benefits gave ISS a better hold on its employees and helped assure their stay at Isfahan. The trial court's conclusion follows:

I conclude that these reasons, individually and in the aggregate, constituted legitimate, non-discriminatory reasons for awarding ISS-sponsored contracts only to persons whose primary purpose for being in Iran was to teach at the American School, and I also conclude that this basis for allocating ISS-sponsored and local-

hire contracts had a manifest relationship to the employment in question. The fact that the sex composition of the pool of local applicants for teaching positions resulted in a disproportionate number of local-hire contracts going to married women does not alter this conclusion.

502 F.2d at 487 (citations omitted).

In the trial court's view, however, ISS was still not in the clear. It went on to state that "ISS's method of implementing a valid policy for awarding contracts has had the effect of discriminating against plaintiffs on the basis of their sex, and that ISS has not articulated any reason, much less a legitimate non-discriminatory reason, for this method." Id.[14]

On the basis of its finding that contracts were awarded according to a teacher's "primary purpose" for being in Iran, the trial court went on to find that ISS's practices discriminated unlawfully against Bryant from that point at which she and her husband separated in April, 1977. At that point Bryant's primary purpose for being in Iran changed and was for the purpose of teaching for ISS. As to Lillibridge, teaching for ISS became her primary purpose for being in Iran when her husband's contract with Bell Helicopter expired in the spring of 1977 and was thereafter renewed so Lillibridge could continue teaching.

## II.

■ Both Bryant and Lillibridge and ISS appeal from the district court's findings of fact and conclusions of law. The view we take, however, makes it unnecessary to consider all the arguments before us on ap-

---

**14.** The trial court's conclusion was based on the fact that:

ISS failed to describe or disclose the basis of its policy to persons hired locally. Further, ISS ascertained the primary purpose for a person being in Iran by the simple expedient of determining if that person's spouse worked in Iran for Bell Helicopter, Grumman, or perhaps another American company. If the teacher's spouse did work for an American company in Iran, ISS assumed that the

teacher's primary purpose for being in Iran was not to teach at the American School but to accompany the spouse. ISS's failure to inform its teachers or local applicants for teaching positions of the primary purpose test, prevented such a teacher from establishing her qualifications for an ISS-sponsored contract in those situations when her primary purpose for being in Iran was, in fact, to teach at the American School.

502 F.Supp. at 587.

peal.[15] Our inquiry begins and ends with appellants' *prima facie* case. Since we are concerned with whether or not the evidence supported the district court's conclusions of law, and not its factual findings, our standard of review is plenary. We must decide, after independent inquiry, whether, as a matter of law, ISS's employment policies were proscribed under Title VII.[16]

This case is governed by controlling legal principles which are relatively clear. A *prima facie* case of employment discrimination may be proved under a theory of disparate impact or disparate treatment. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 581–82, 98 S.Ct. 2943, 2952, 57 L.Ed.2d 957 (1978) (Marshall, J., concurring in part). Under the latter theory a person need only show that

> [t]he employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin. *Proof of discriminatory motive is critical*, although it can in some situations be inferred from the mere fact of differences in treatment. Undoubtedly, disparate treatment was the most obvious evil

Congress had in mind when it enacted Title VII.

*International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1854 n.15, 52 L.Ed.2d 396 (1977) (emphasis added) (citations omitted). Plaintiff has the initial burden of proving by a preponderance of the evidence a *prima facie* case of discriminatory treatment, but plaintiff's burden is not "onerous." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *see also, Jackson v. U. S. Steel Corporation*, 624 F.2d 436 (3d Cir. 1980). In *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court articulated the elements of the *prima facie* case within the context of a claim of racial discrimination in hiring, but its standard is equally applicable in the case of a sex discrimination claim. *Kunda v. Muhlenberg College*, 621 F.2d 532, 541 (3d Cir. 1980). In *McDonnell Douglas*, the Supreme Court stated that:

> The complainant in a Title VII trial must carry the initial burden under the statute

---

**15.** Bryant and Lillibridge appeal from the district court's award of monetary damages for several reasons. They believe that the district court's articulation of a "primary purpose" test as the standard used by ISS in awarding its contracts was error. Furthermore, they contend, the district court, in reaching its decision, applied this "primary purpose" test to appellants in a sexually discriminatory manner. In appellants' view, the reasons proffered by ISS for its dual contract policy were neither legitimate, nondiscriminatory, nor business-related and it was error for the district court to conclude that it was only in the implementation of its policy that ISS unlawfully discriminated against appellants. In its appeal, ISS argues that Title VII does not have extraterritorial effect and that the trial court, thus lacking jurisdiction, erred in not dismissing appellants' complaints. Additionally, appellee asserts as error, the trial court's conclusion that the appellants had established a *prima facie* case of sex discrimination and satisfied their ultimate burden of proof. Once the district court determined that ISS had successfully rebutted appellants' *prima facie* case, ISS contends that it was error for the court thereafter to hold that ISS, in the implementation of its policy, unlawfully discriminated against appellants on the basis of their sex.

**16.** In *Detroit Police Officers Association, et al. v. Young*, 608 F.2d 671 (6th Cir. 1979), *cert. denied*, 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981), the Sixth Circuit's comments appropriately describe the standard of review.

> The district court's findings of fact are binding on this court unless they are clearly erroneous. Fed.R.Civ.P. 52(a). However, *whether prior discrimination occurred is a conclusion of law based on subsidiary findings of fact.* As stated by the Seventh Circuit:
> The statement that discrimination exists for the purposes of establishing liability under Title VII or under the Constitution . . . is as much a conclusion of law as a finding of fact. A distinction must be drawn between subsidiary facts to which the "clearly erroneous" standard applies, and the ultimate fact of discrimination . . . Accordingly, we will make an independent examination of whether the Police Department's employment practices, as a matter of law, were proscribed under Title VII . . . . *United States v. City of Chicago*, 549 F.2d 415, 425 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); *See also Wade v. Mississippi Cooperative Extension Service*, 528 F.2d 508, 516 (5th Cir. 1976).

608 F.2d at 686 (emphasis added).

of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications....

The burden then must shift to the employer to articulate some legitimate, non-discriminatory reason for the employee's rejection.

411 U.S. at 802, 93 S.Ct. at 1824. However, this is not an inflexible rule for:

[t]he facts necessarily will vary in Title VII cases, and the specification ... of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations.

*Id.* at 802 n.13, 93 S.Ct. at 1824 n.13. *See also Kunda v. Muhlenberg College,* 621 F.2d at 542.

■ A presumption of unlawful discrimination arises from establishment of the *prima facie* case, *Texas Department of Community Affairs v. Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094. The *prima facie* case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Construction Co. v. Waters,* 438 U.S. at 577, 98 S.Ct. at 2949.

■ A claim of disparate impact involves employment practices which are facially neutral but that in fact have a more discriminatory effect upon one group than another. The seminal case on the disparate impact method of proving unlawful discrimination is *Griggs v. Duke Power Company,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), which informs us that Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Id.* at 431, 91 S.Ct. at 853. Although a plaintiff need not show discriminatory motive or intent under a disparate impact theory, *id.* at 431–432, 91 S.Ct. at 853–854, proof of actual discrimination is a necessary element. Plaintiffs must show that a facially neutral standard results in a significantly discriminatory pattern or impact. *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Company, supra.* It is only after plaintiff has established this *prima facie* case of discrimination that the burden of going forward with evidence to justify the suspect practice as business-related and racially or sexually neutral shifts to the employer. *Dothard v. Rawlinson,* 433 U.S. at 329, 97 S.Ct. at 2726; *Albemarle Paper Company,* 422 U.S. at 425, 95 S.Ct. at 2375; *Griggs v. Duke Power Company,* 401 U.S. at 431, 91 S.Ct. at 853.

The court below held that appellants had shown that ISS's dual contract policy constituted a *prima facie* case of sex discrimination because it involved disparate treatment of women and had a disparate impact upon married women.[17] The court found

17. The court below stated that appellants were attacking ISS's discriminatory hiring practices and conceptualized the problem as one of discriminatory hiring in its opinion. Before us appellants now state that "it is not defendant's hiring practices which are at issue; [appellants] never claimed that ISS did not want to hire women or preferred to hire men rather than women. The discrimination complained of arose only as to how ISS paid persons already hired and was unrelated to the male/female ratio in hiring .... The discrimination complained of is in remuneration and thus affects only actual employees." Appellants' Reply Brief at 24–25. Appellants seem

to be making a sex-based benefit or wage discrimination claim which would normally come under the Equal Pay Act of 1963, 29 U.S.C. § 206(d). However, the Equal Pay Act is restricted to employers covered by the Fair Labor Standards of 1938, as amended, 29 U.S.C. §§ 201–219. (FLSA) The FLSA, as amended in 1957, specifically excludes coverage "with respect to any employee whose services during the work week are performed in a workplace within a foreign country..." FLSA, 29 U.S.C. § 213(f). *See County of Washington v. Gunther,* 452 U.S. 161, at 166, 101 S.Ct. 2242, at 2246, 68 L.Ed.2d 751 (1981), citing S.Rep.No. 176, 88th Cong., 1st Sess., 2 (1963). *See also,*

that appellants were treated differently because of their sex and marital status.[18] Both the trial court and appellants relied in the first instance upon statistical evidence of the impact of ISS's contract policy. We recognize that statistical proof serves "an important role" in discrimination cases and that it may often successfully establish plaintiff's *prima facie* case. *See International Brotherhood of Teamsters v. United States*, 431 U.S. at 339–40, 97 S.Ct. at 1856. *See also* D. Baldus and J. Cole, Statistical Proof of Discrimination (1980); Note, Employment Discrimination: Statistics and Preferences under Title VII, 59 Va.L.Rev. 463 (1973). And we take heed of the observation made by Judge Brown in *Alabama v. United States*, 304 F.2d 583, 586 (5th Cir. 1962), that "statistics often tell much, and courts listen." But this case instructs us that the story statistics tell depends, not unlike beauty, upon the eye and ear of the beholder, and that we must apply a critical and cautious ear to one dimensional statistical presentation.[19]

## A. APPELLANTS' DISPARATE IMPACT CLAIM

■ The trial court upheld appellants' assertion that the statistics in this case show a disparate impact based on sex and marital status. The critical statistic was the fact that 97 out of 98 local-hire contracts went to married women, of whom two were appellants. But that statistic alone is not sufficient to establish a *prima facie* case of disparate impact in the face of uncontested evidence that: (1) between 1975 and 1979, females received 240 of the 476 ISS-sponsored contracts awarded (50.42%); and (2) of those contracts awarded to persons already in Iran, females received 17 of 31 (54.7%). A mere showing of the sexual and marital composition of the local-hire teaching staff, without more, reveals little about ISS's practices so far as the awarding of the more desirable ISS-sponsored contracts.

Although we recognize that appellants need not use actual labor market or applicant figures to show disparate impact, *Dothard v. Rawlinson*, 433 U.S. at 330, 97 S.Ct. at 2727 (1977); *Griggs v. Duke Power Co.*, 401 U.S. at 430, 91 S.Ct. at 853 (1971), in the peculiar circumstances of this case, they must offer at least comparative statistics by which we can infer an invidious disparate impact. *Dothard v. Rawlinson*, 433 U.S. at 330, 97 S.Ct. at 2727 (generalized national statistics used to demonstrate the differential impact of the Alabama Board of Corrections' height and weight requirements). *See also EEOC v. Greyhound*, 635 F.2d 188, 191 (3d Cir. 1980) (a claim of racial discrimination on a disparate impact theory rejected by this court's holding that no *prima facie* case of racial discrimination had been proved because "the EEOC produced no evidence that Greyhound's no-beard policy selects applicants for hire or promotion in a

---

*International Union of Electrical, Radio and Machine Workers, et al. v. Westinghouse Electric Corp.*, 631 F.2d 1094 (3d Cir. 1980), *cert. denied*, 452 U.S. 967, 101 S.Ct. 3121, 69 L.Ed.2d 980 (1981). Furthermore, the Equal Pay Act's four affirmative defenses exempt wage differentials attributable to seniority, merit, quantity and quality of production, or "any other factor other than sex." 29 U.S.C. § 206(d)(1).

18. In what has come to be known as a "sex-plus" problem, a claim of sex discrimination may be premised upon marital status. For the original use of this term see *Phillips v. Martin Marietta Corp.*, 411 F.2d 1 (5th Cir.), *petition for rehearing denied*, 416 F.2d 1257, *vacated and remanded*, 400 U.S. 542, 90 S.Ct. 496, 27 L.Ed.2d 613 (1971), Judge Brown dissenting to the denial of a petition for rehearing *en banc*. B. Schlei and P. Grossman, Employment Discrimination Law (1976) at 337 n.127.

"A sex-plus problem arises whenever an employer adds a criterion or factor for one sex [e.g., marital status], which is not added for the other sex." Schlei and Grossman at 337. This is not a "sex-plus" case. *See* H. Kay, Sex-Based Discrimination (2d ed. 1981) at 484–535.

19. In *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the government's discrimination claim against the company and union involved substantial statistical proof. Although the Court noted "the important role" of "statistical analyses," it cautioned that "their usefulness depends on all of the surrounding facts and circumstances." *Id.* at 339–340, 97 S.Ct. at 1856. In that case "cold numbers" were brought to life by individual testimony about personal experiences with the union and company.

racial pattern significantly different from that of the pool of applicants.")

The court below had no knowledge of either the applicant pool, the relevant labor market in Iran or other data from which to infer disparate impact. It knew only the distribution by sex of the persons actually hired. Simply because the hiring profile is skewed one cannot assume that the skewing was caused by sex discrimination, given the fact that females received at least 50% of the ISS-sponsored contracts, whether hired in Iran or the United States.

Just as Justice Holmes said, "a page of history is worth a volume of logic," *New York Trust Company v. Eisner*, 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921), here perhaps an analogy is worth pages of statistical extrapolation. If one were hiring archeologists at a dig in Iran, and 99 archeologists applied, of whom only one was a woman, and if 50 were hired, 49 males and one female, could one conclude that the disparity of 49 males versus one female proved sex discrimination in violation of Title VII?

■ We are not unsympathetic to the fact that the appellant's failure to produce sufficient evidence to establish a *prima facie* case was attributable in part to the present inaccessibility of the records caused by the revolution in Iran. However, when persons seek monetary damages, they cannot make the defendant pay simply because it was difficult or impossible for the plaintiffs to obtain the records necessary to prove a *prima facie* case.

Appellants argue that since they are making a claim of discrimination in benefits or remuneration, and not of discriminatory hiring, the appropriate reference group is the actual work force in Iran and not applicant or labor market pools. This means that we must look beyond just the data on local-hire contracts. From the statistical data available on the allocation of ISS-sponsored contracts, the trial court found that "a comparison of the various pools applica-

ble to ISS's overall allocation of ISS-sponsored contracts (including those awarded from Princeton and those awarded locally in Iran) discloses that women received the expected number of the more favorable contracts." 502 F.Supp. at 486.[20] During the period in which one or both appellants were teaching in Iran, females held 240 of the 476 ISS-sponsored contracts awarded (50.42%). Given these figures, appellants' claim cannot rest on an assertion of disparate impact on females generally, for females in fact had 50.42% of the ISS-sponsored contracts on a staff in which females constituted 58.7% (337/574) of the total staff.

■ In order to determine whether or not there was a disparate impact on married women, *appellants must show that married women were disproportionately denied ISS-sponsored contracts.* Evidence that only married women had local-hire contracts does not tell us the number of married women, in contrast to the number of married men, denied the more lucrative ISS-sponsored contracts. *In Yuhas v. Libbey-Owens-Ford Co.*, 562 F.2d 496 (7th Cir. 1977), *cert. denied*, 435 U.S. 934, 98 S.Ct. 1510, 55 L.Ed.2d 531 (1978), a case relied on by the trial court, the no-spouse rule disqualified 71 women and only three men from a job (or benefit) equally sought by women and men. The court here had no such statistical showing before it. Married women were disproportionately awarded local-hire contracts, but given the facts in this case, any facile conclusion that this proved a disproportionate denial of ISS-sponsored contracts to women because of their sex or marital status is error.

We do not mean to imply that appellants have not been differentially affected by ISS's practices. We only hold that they have not shown that it was a result which flows from invidious discrimination against them because of their sex or marital status. *In City of Los Angeles Department of*

---

**20.** An extensive statistical analysis of possible adverse impact resulting from the overall allocation of ISS-sponsored contracts was before the trial court. However, since the allocation of those contracts is not at issue, examination of that data is not required here.

*Water and Power v. Manhart*, 435 U.S. 700, 712 n.20, 98 S.Ct. 1370, 1377 n.20, 55 L.Ed.2d 657 (1978), the Supreme Court noted that "[e]ven a completely neutral practice will inevitably have some disproportionate impact on one group or another. *Griggs* does not imply, and this Court has never held, that discrimination must always be inferred from such consequences." Appellants' claim falls squarely within the ambit of those comments.

### B. APPELLANTS' DISPARATE TREATMENT CLAIM

In addition to finding disparate impact on married women, the trial court also found disparate treatment of women. The trial court agreed with appellants that ISS's disputed contract practices constituted disparate treatment which was impermissibly based on sex. This conclusion "must be evaluated in light of [ISS's] practices toward the allegedly more favored group, in this case males." *Kunda v. Muhlenberg College*, 621 F.2d at 538. "The central focus of inquiry in a case such as this is always whether the employer is treating 'some people less favorably than others because of their ... sex ...'" *Furnco Construction Corp. v. Waters*, 438 U.S. at 577, 98 S.Ct. at 2949 (citation omitted).

The classic method of establishing disparate treatment set forth in *McDonnell Douglas Corporation v. Green, supra,* is less applicable in this case because discriminatory hiring is not attacked.[21] But appellants must show at a minimum that ISS's practices do not pass a simple test: The evidence must show that women, or married women in particular, were treated in a manner which "but for their sex would have been different." *City of Los Angeles Department of Water v. Manhart*, 435 U.S. at 711, 98 S.Ct. at 1377 (footnote omitted;

citation omitted). *See also Jackson v. U. S. Steel Corp.*, 624 F.2d at 440–441 (3d Cir. 1980) and *Sprogis v. United Air Lines, Inc.*, 444 F.2d at 1205. To prove their *prima facie* case appellants' must produce evidence that similarly situated males were treated differently and that there was no adequate nonsexual explanation for the different treatment. *Texas Department of Community Affairs v. Burdine*, 450 U.S. at 253, 101 S.Ct. at 1094.

Initially we must determine what class of males were similarly situated as appellants—that is, married women living in Iran with spouses who worked for other companies. Absent proof of the standard applied to similarly situated males, appellants have not established that such standard differs from the one applied to females. No evidence was before the trial court to show that married males, in circumstances similar to appellants, received better, or even different treatment. In *Jurinko v. Edwin L. Wiegand Co.*, 477 F.2d 1038 (3d Cir.), *vacated and remanded on other grounds*, 414 U.S. 970, 94 S.Ct. 293, 38 L.Ed.2d 214 (1973), a discriminatory hiring case involving married women, the court found that the plaintiffs failed to prove sex discrimination on the basis of marital status "since no showing was made that married men were hired while plaintiffs' applications were pending." *Id.* at 1044.

> Discrimination against married women constitutes discrimination on the basis of sex only if a different standard, i.e., the marital status of the person, has been applied to men and women. Absent proof of the standard applied to men, obviously the plaintiffs have not established that such standard differs from the one applied to women.

*Id.* at 1044.

Appellants here were not confronted with the kind of differential standards applied in

---

**21.** Noting in *International Brotherhood of Teamsters v. United States, supra,* that the *McDonnell Douglas* pattern was not the only means of establishing a *prima facie* case, the Supreme Court stated that:

> The importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof there required, but in its rec-

ognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act.

431 U.S. at 358, 97 S.Ct. at 1866.

*Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 90 S.Ct. 496, 27 L.Ed.2d 613 (1971). There the employer refused to hire women with pre-school children while hiring married men with pre-school children. Solely because of their sex, plaintiffs in *Phillips* were treated less favorably than were married men. ISS's policy is also unlike the "no-marriage rule" in *Sprogis v. United Airlines*, 444 F.2d 1194 (7th Cir.), *cert. denied*, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971), wherein the employer's policies resulted in differential treatment of males and females because of their sex and marital status. Here the employer's dual contract policy was not applied differentially according to sex or marital status. It applied to all persons—male and female, single and married.

█ We recognize that Title VII is concerned with discriminatory treatment of individuals and not classes. *City of Los Angeles Department of Water v. Manhart, supra*, 435 U.S. at 709, 98 S.Ct. at 1375. But even with that mandate as our guide, we do not find, in light of the statistical data showing that women had been awarded over 50% of the ISS-sponsored contracts, whether hired in Iran or the United States, appellants have proved discriminatory intent or motive, a critical element of proof in a disparate treatment case. *International Brotherhood of Teamsters v. United States*, 431 U.S. at 336, 97 S.Ct. at 1854. Accepting as true the trial court's finding that married women with local-hire contracts were not shown the personnel policies or told about the dual contract policy, a finding of discriminatory treatment only follows if the evidence shows that ISS's behavior was deliberate or resulted from discriminatory motives and that married men were treated differently.

### III.

In many ways this case may be unique because of its unusual facts. Our holding in this case does not mean that appellants' claims are frivolous. We hold only that the evidence introduced by appellants in this case is insufficient to support a conclusion that appellants had established a *prima facie* case of discrimination violative of the commands of Title VII. So that our holding will not be misunderstood, we should point out what this case does *not* involve. This is not a case where the company's dual contract policy explicitly gave better benefits to men and inferior benefits to women. This is not a case where the company explicitly gave superior benefits to husbands and inferior benefits to wives. This is not a case where women had a minescule percentage of the higher paying jobs—the ISS-sponsored contracts.

We do not write oblivious to the fact that for centuries women (whether married or single) were victims of egregious discrimination which cast them in inferior roles throughout American society.[22] We recog-

---

**22.** As Professor Herma H. Kay has noted in her classic work, *Sex-Based Discrimination*:

#### A. THE TRADITION

\*    \*    \*    \*    \*    \*

The notion that men and women stand as equals before the law was not the original understanding. Thomas Jefferson put it this way:

Were our state a pure democracy there would still be excluded from our deliberations women, who, to prevent depravation of morals and ambiguity of issues, should not mix promiscuously in gatherings of men. Alexis de Tocqueville, some years later, included this observation among his commentaries on life in the young United States:

In no country has such constant care been taken as in America to trace two clearly distinct lines of action for the two sexes, and to make them keep pace one with the other, but in two pathways which are always different. American women never manage the outward concerns of the family, or conduct a business, or take a part in political life. During the long debate over women's suffrage the prevailing view of the natural subordination of women to men was rehearsed frequently in the press and in legislative chambers. For example, an editorial in the New York Herald in 1852 asked:

How did women first become subject to man as she now is all over the world? By her nature, her sex, just as the negro, is and always will be, to the end of time, inferior to the white race, and, therefore, doomed to subjection; but happier than she would be in any other condition, just because it is the law of her nature. The women themselves would not have this law reversed

nize the relevance of Circuit Judge Shirley Hufstedler's statement that "[a] bicentennial celebration of women's equality in law and in fact cannot be scheduled because the inaugural date has not arrived." S. Hufstedler, *Women and the Law*, Aspen Center for Humanistic Studies. However, our awareness of the injustices of the past and the present cannot be a substitute for plaintiffs' deficiencies in proof on the present record. Appellants have not demonstrated that ISS's employment, and contract practices were intended or designed to discriminate, or had the effect of doing so in a manner prohibited by Title VII.[23]

The judgment of the district court will be reversed and the district court directed to grant judgment for ISS—each party to bear its own costs.

GIBBONS, Circuit Judge, concurring.

I concur in the judgment, but I arrive at that conclusion by a slightly different route. Unlike the majority I believe the district court correctly found that plaintiffs made out a prima facie case. I conclude, however, that it was successfully rebutted.

Since Bryant and Lillibridge were hired as teachers this is a compensation case, not a hiring practices case. We proceed on the assumption that they and other male and female teachers on the faculty of the American School were equally qualified, or at least that differences in compensation other than the special allowances complained of reflected differences in qualifications or responsibilities. The narrow issue is whether either Bryant or Lillibridge made out a case that their sex was the reason they were denied equal compensation.

The evidence establishes that during the four years in issue there were 574 contracts awarded to teachers at the American School. Of these 476 were ISS sponsored, and thus paid higher benefits, and 98 were local-hire, and thus paid lower benefits. Of the 476 ISS sponsored contracts 240 were awarded to women and 236 to men. It thus appears that sex probably was not a factor in determining whether to award the ISS sponsored contracts. Of the 98 local-hire contracts, however, 97 were with females and only one with a male. All local hire contracts were to married persons, but in the instance of the one male awarded such a contract the evidence suggests that he received the lower compensation because for one year his qualifications were deficient. Thus, for purposes of our analysis, his contract may be disregarded. What then emerges is that in a pool of employees of equal qualifications, where two levels of compensation are paid, only females have been paid at the lower rate. This fact, without more, is circumstantial evidence sufficient to support the inference either that sex discrimination is the intended reason for that result (disparate treatment) or that some factor other than sex is causing a disparate impact on women.

I agree with the district court that these statistics about compensation sufficed to place on the employer the burden of producing evidence that a business reason other than sex produced the observed disparity. ISS did produce evidence that its dual contract policy was necessary because: (1) extra benefits were necessary to recruit persons coming to Iran primarily to teach; (2) the Iranian government objected to paying duplicate benefits to spouses of employees receiving benefits from another contractor; and (3) the extra benefits gave ISS a better hold on employees in Iran primarily to teach. The trial court credited this evidence, finding:

> relationship to her husband as "something better than his dog, a little dearer than his horse," was just beginning to erode.
> Kay, Sex-Based Discrimination at 1–2.

\* \* \* \* \* \*

Mid-nineteenth century feminists, many of them diligent workers in the cause of abolition, looked to Congress after the Civil War for an express guarantee of equal rights for men and women. Viewed in historical perspective, their expectations appear unrealistic. A problem of far greater immediacy faced the nation. Moreover, the common law heritage, ranking the married woman in

**23.** Our holding in no way answers the questions raised by appellee's jurisdictional challenge. No court has decided the extraterritorial applicability of Title VII and we find it unnecessary to do so to decide this case.

I conclude that these reasons, individually and in the aggregate, constituted legitimate, non-discriminatory reasons for awarding ISS-sponsored contracts only to persons whose primary purpose for being in Iran was to teach at the American School, and I also conclude that this basis for allocating ISS-sponsored and local-hire contracts had a manifest relationship to the employment in question.

*Bryant v. International School Services, Inc.,* 502 F.Supp. 472, 487 (D.N.J.1980). This finding is not clearly erroneous, and suffices to overcome the inference from circumstantial evidence that sex discrimination in the award of local-hire contracts was intended.

Bryant and Lillibridge urge, however, that one additional factor must be taken into account. With one exception not relevant, all persons who were awarded local-hire contracts were married women. Thus, they claim, even if ISS's business reasons are credited those practices had a disparate impact on women, and no sufficient justification was advanced for imposing that impact. The trial court concluded that awarding ISS contracts on the basis that the teacher's primary reason for being in Iran was to teach there was a sufficient business reason for permitting such disparate impact as occurred. An inference can be drawn from the fact that only married women were given local-hire contracts that the pool of persons qualified as teachers who were in Iran primarily for purposes other than teaching there consisted largely of married women. But even accepting that inference, it in no way detracts from the legitimacy of the business purpose behind the local-hire differential. The makeup of the local-hire pool of qualified persons was determined not by the ISS business purpose, but by circumstances over which ISS had no control. The trial court held, and I agree, that the local-hire vs. ISS sponsored contract differential benefits program reflected a valid non-sexual business policy.

The trial court concluded, however, that this valid policy was implemented in a manner which had a discriminating effect upon Bryant and Lillibridge, because in each case ISS failed to award increased benefits to them when their primary purpose for being in Iran changed.[1] I understand the court's holding to be based on disparate impact rather than disparate treatment, for there is no evidence that the post-employment personnel practices it discussed were in any way different for male or female teachers. I do not think the court's conclusion can withstand analysis.

The evidence is that ISS awarded contracts annually. Bryant entered into a local-hire contract in October 1976. In March 1977 she and her husband decided to separate and seek a divorce. She completed the 1976–77 school year and returned to the United States. The court concluded that from March of 1977 forward her primary purpose in being in Iran was to teach, and awarded higher benefits for that period. If there was any disparate impact in her case it arose not from the valid differential between local-hire and ISS sponsored contracts, but from the practice of the American School of awarding annual contracts. At the time she contracted the local-hire policy was correctly applied, and the business purpose for contracting with teachers on an annual basis is patently valid.

Lillibridge's case is similar. She contends that her husband extended his commitment to Bell Helicopter in April, 1977 so that she could fulfill her contract for the 1976–77

---

1. The trial court's conclusion was based on the fact that:

   ISS failed to describe or disclose the basis of its policy to persons hired locally. Further, ISS ascertained the primary purpose for a person being in Iran by the simple expedient of determining if that person's spouse worked in Iran for Bell Helicopter, Grumman, or perhaps another American company. If the teacher's spouse did work for an American company in Iran, ISS assumed that the teacher's primary purpose for being in Iran was not to teach at the American School but to accompany the spouse. ISS's failure to inform its teachers or local applicants for teaching positions of the primary purpose test, prevented such a teacher from establishing her qualifications for an ISS-sponsored contract in those situations when her primary purpose for being in Iran was, in fact, to teach at the American School.

   502 F.Supp. at 487.

year and continue teaching in the 1977–78 year. The Court awarded extra compensation from April 1977 through June 1978. As to the 1976–77 contract, the analysis we make in Bryant's case applies. When the local-hire contract was awarded her primary purpose for being in Iran was other than teaching. That is not the case with respect to the 1977–78 contract. However the evidence on which the trial court relied in finding that the pay differential should be paid was that Lillibridge was not adequately informed of the availability of an ISS sponsored contract for persons situated as she was. At best, however, this lack of information establishes poor personnel administration, impacting equally on both men and women in the teaching staff of the American School. The sex-based impact of poor personnel practices is in her case happenstance. It does not support a charge of disparate sexual impact.

Thus I agree that the judgment appealed from must be reversed and judgment entered for ISS.

